# United States District Court

### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| GINA PIKE | § | |
| **Plaintiff** | § | |
| | § | |
| V. | § | **Civil No.  4:17CV772** |
| | § | **Judge Mazzant/Magistrate Judge Craven** |
| **HARTFORD LIFE AND ACCIDENT** | § | |
| **INSURANCE COMPANY** | § | |
| **Defendant** | § | |

---

## REPORT AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

---

The above-referenced cause of action was referred to the undersigned United States Magistrate Judge for pre-trial purposes in accordance with 28 U.S.C. § 636.  The parties have filed a stipulated administrative record and have submitted this matter to the Court for trial on the briefs. The following motions are before the Court:

> **Plaintiff's Motion for Judgment on the Record (Docket Entry # 17); and**

> **Defendant Hartford Life and Accident Insurance Company's Cross-Motion for Judgment on the Record (Docket Entry # 25).**

Having heard oral argument and having considered the materials submitted by the parties, the Court finds for Plaintiff under the following recommended findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).[1]

---

[1] Where appropriate, any finding of fact herein that should more appropriately be regarded as a conclusion of law shall be deemed as such, and vice versa.  *See Martin v. Trend Pers. Servs.*, No. 3:13-CV-3953-L, 2015 WL 7424757, at *1 (N.D. Tex. Nov. 23, 2015), *aff'd*, 656 Fed. Appx. 34 (5th Cir. 2016).

# I. BACKGROUND

This Employee Retirement Income Security Act ("ERISA") action concerns the termination of Gina Pike's ("Plaintiff") long term disability ("LTD") benefits, pursuant to 29 U.S.C. § 1132 (a)(1)(B).  Plaintiff seeks recovery of long term disability benefits under an ERISA-governed plan offered by her former employer and insured by Defendant Hartford Life and Accident Insurance Company ("Defendant" or "Hartford"). Hartford paid Plaintiff's claim for LTD benefits from April 24, 2008 through December 14, 2016, the period of time when Hartford determined Plaintiff met the definition of "disability" in the policy.  However, after later determining Plaintiff was unable to prove she continued to be "disabled" under the policy, Hartford discontinued LTD benefits effective December 15, 2016. The issue then is whether Plaintiff is entitled to receive LTD benefits after December 14, 2016 under the applicable policy.

Plaintiff alleges she is entitled to recover under the civil enforcement provisions of ERISA, specifically 29 U.S.C. §1132 (a)(1)(B) and 29 U.S.C. § 1133.[2] Docket Entry # 1 at 2. Plaintiff seeks the benefits she has been denied plus pre-judgment and post-judgment interest, recovery of attorney's fees and costs, clarification of her right to receive future benefits under the policy, and any other appropriate equitable relief.  Docket Entry # 1 at 3.

---

[2] Not only does Plaintiff seek recovery of benefits pursuant to § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), she also references § 503 of ERISA, 29 U.S.C. § 1133 ("Claims procedure").  This provision provides that every employee benefit plan shall--

> **(1)** provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

> **(2)** afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C.A. § 1133 (West).

The parties have filed cross motions for judgment on the record as well as the administrative record compiled by Hartford during the administration of Plaintiff's claim (the "Agreed Administrative Record").[3]   The Court's findings and conclusions are based upon the Agreed Administrative Record. *Abate v. Hartford*, 471 F. Supp. 2d 724, 732 (E.D. Tex. 2006) ("Generally, a plaintiff suing under ERISA is limited to the administrative record that was before the plan administrator."); *see also Cooper v. Hewlett–Packard Co.,* 592 F.3d 645, 657–58 (5th Cir. 2009) (same); *see also Ariana M. v. Humana Health Plan of Texas, Inc.*, 884 F.3d 246, 257 (5th Cir. 2018) (stating that changing the standard of review for factual determinations to *de novo* does not require the court to alter its precedent concerning the scope of the record in ERISA cases and further stating "*Vega* will continue to provide the guiding principles on the scope of the record for future cases that apply *de novo* review to fact-based benefit denials").[4]

Plaintiff's medical history, as well as the facts behind Hartford's termination of LTD benefits, are long and complex.  The following constitutes the relevant facts based on the Agreed

---

[3] The 2,266-page sealed Agreed Administrative Record will be cited herein as "AR."

[4] In *Vega v. National Life Insurance Services, Inc.*, 188 F.3d 287 (5th Cir. 1999) (en banc), *overruled on other grounds by Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008), the Fifth Circuit held a plan administrator must identify evidence in the administrative record, giving claimants a chance to contest whether that record is complete. *Ariana M.*, 884 F.3d at 256 (citing *Vega*, 188 F.3d at 299). Once the record is finalized, a district court must remain within its bounds in conducting a review of the administrator's findings, even in the face of disputed facts. *Id. Vega* permits departure from this rule only in very limited circumstances. *Id.* "One exception allows a district court to admit evidence to explain how the administrator has interpreted the plan's terms in previous instances." *Ariana M.*, 884 F.3d at 256 (citing *Vega*, 188 F.3d at 299) (citing *Wildbur v. ARCO Chem. Co.*, 974 F.2d 631, 639 n.15 (5th Cir. 1992)). Another allows a district court to admit evidence, including expert opinions, to assist in the understanding of medical terminology related to a benefits claim. *Id.* According to the Fifth Circuit in *Ariana M.*, "those situations are not actually expanding the evidence on which the merits are evaluated but providing context to help the court evaluate the administrative record." 884 F.3d at 256.  Here, the Court remains within the bounds of the administrative record.

Administrative Record.

## II.  RECOMMENDED FINDINGS OF FACT

**A.     Hartford's Policy**

Hartford issued an insurance policy, identified as Hartford policy number GLT-675193 ("the Policy"), effective January 1, 2005, describing benefits effective July 1, 2016 to Plaintiff's employer, Gambro, Inc. Exhibit A to Plaintiff's Motion for Judgment on the Record (Docket Entry # 17-1); AR 2036-2037. Plaintiff is insured for LTD benefits under the Policy. The Policy does not grant discretionary authority to the Plan Administrator or the Claims Administrator.[5]

Under the Policy, a claimant is entitled to LTD benefits if she is "disabled" throughout and beyond the "Elimination Period" (the first 90 days of disability).  *Id*. at 25-26. A claimant is "disabled" during the first 24 months if she is "prevented from performing one or more of the Essential Duties" of her "Own Occupation." *Id*.  The Policy changes its definition of disability after 24 months' benefits have been paid. Thereafter, a claimant is "disabled" if she is "prevented from performing one or more of the Essential Duties" of "Any Occupation." *Id*. "Any Occupation" means any occupation for which the claimant is qualified by education, training or experience and that has an earnings potential greater than the lesser of the product of the claimant's "Indexed Pre-disability earnings and the Benefit Percentage;" or "the Maximum Monthly Benefit." *Id*. at 25.

"Essential Duty" means a duty that:

---

[5] Of the five Hartford policies spanning Plaintiff's claim, all are identified with the same policy number, GLT-675193, and the same effective date, January 1, 2005. *See* Docket Entry # 15 at 3.  According to Plaintiff, the 2006 policy contained a discretionary clause which, if not found void under Texas law, granted discretionary authority to Hartford, the plan fiduciary. However, the plan administrator removed all discretionary authority from Hartford as of January 1, 2013, nearly four years prior to the date Hartford denied Plaintiff's claim. *Id.*

4

1) is substantial, not incidental;

2) is fundamental or inherent to the occupation, and

3) cannot be reasonably omitted or changed.

*Id.* at 26. A claimant's ability to work the number of hours in her regularly scheduled workweek is an "Essential Duty." *Id.*

**B.     Plaintiff's background**

By January 2008, Plaintiff had worked for seventeen years as a microbiologist and had reached a supervisory level at her job. AR 467.  As a microbiologist, Plaintiff was "responsible for writing all the documents sent to FDA for product submission;" she created reports and data and led the management review board meetings; she supervised the complaint and product released groups and was responsible for medical device recalls and microbiology investigations.  AR 467.

Plaintiff had suffered from severe back pain since at least 2002, when a diagnostic lumbar discogram revealed severe pathology at her L4-5, L5-S1 intervertebral levels, as well as less severe degeneration at her L3-4 level.  AR 507-08.  Plaintiff underwent surgery in 2002 on her L4-S1 levels and improved for a time, but she began to deteriorate in 2004.  AR 521, 533-34.  By 2007, Plaintiff could not sit in a chair, lie in a bed, or stand for any significant length of time.  AR 521.  An examination at that time revealed her prior L4 to S1 fusion was stable, but she was experiencing transitional instability at her L3-4 level.  AR 524. On March 25, 2008, Plaintiff underwent an extreme interbody fusion at L3-4.  AR 787-89.

**C.     Plaintiff's LTD Claim**

On March 28, 2008, Plaintiff applied for LTD benefits (the "LTD Claim") with Hartford. AR 971, 2037, 2261-62, 2253-57, and 2251. In the application, Plaintiff reported she was unable to

continue working as a regulatory affairs group leader because of an interbody fusion surgery "needed due to degeneration of [her] spine at the L3-L4 vertebrae locations." AR 786, 2254. Plaintiff stopped working on January 24, 2008, but expected to return to work on July 31, 2008.  AR 2254. Plaintiff sought LTD benefits to cover three to four months of post-surgery recovery time not covered by her employer Gambro's short term salary continuation, which would expire on April 28, 2008.  AR 2037.

Along with the application, Plaintiff submitted an Attending Physician's Statement of Disability ("APS") dated March 28, 2008, and completed by Plaintiff's then-treating neurological surgeon Dr. Robert Martin.  AR 2259-60 ("APS No. 1"). In APS No. 1, Dr. Martin confirmed Plaintiff underwent a L3-4 lateral interbody fusion on March 25, 2008 to treat lumbar/sacral instability and lower back pain.  AR 2259. Dr. Martin placed specified physical restrictions and limitations on Plaintiff during the surgery recovery period.  AR 2260. Dr. Martin also submitted records regarding the surgery and records of his pre-surgery office visits with Plaintiff that noted the reasons for the surgery (*i.e.*, Plaintiff had a history of low back pain; she underwent a spinal fusion in December 2002; the pain returned in 2004 and became unmanageable).  AR 2077-2083 at 2082. Hartford also interviewed Plaintiff and memorialized her responses, which focused on her expected recovery, and confirmed Plaintiff's objective to return to work after she recovered from the surgery. AR 969.

**D.     Hartford approved the claim effective April 24, 2008**

Based on APS No. 1, the medical records submitted by Dr. Martin's office, and Plaintiff's subjective statements regarding her post-surgery functionality, Hartford noted Plaintiff expected to return to work four months after the surgery.  AR 968. However, that meant Plaintiff could not return

to work until after the Elimination Period due to her post-surgery recovery, which limited Plaintiff from performing the physical tasks required for her occupation as a regulatory affairs group leader ("constant sitting, walking, stooping, kneeling and reaching").  AR 968. Finding Plaintiff unable to perform her "Own Occupation," Hartford approved the claim effective April 24, 2008.  AR 1039-1042 (Letter dated April 26, 2008).

In December 2008, the LTD Claim was referred to Hartford's Special Investigations Unit ("SIU") for investigation because (1) "[Plaintiff] . . . had multiple address changes," moving between homes in Florida and then from Florida to Texas; (2) "[Plaintiff's] telephone number was answered with a business name;" (3) per an Internet search, Plaintiff's name "may be attached to a business;" and (4) Plaintiff's self-reported limited functionality and that provided by Dr. Martin seemed inconsistent with the fact that Plaintiff and her husband moved to Texas to take care of her husband's mother. AR 1297-1301 (2008 SIU Case Report). Video surveillance was conducted during the investigation. *Id*. The investigation was later closed. *Id*.

Hartford continued to administer the LTD Claim and obtained updated medical information for Plaintiff.  The information showed Plaintiff would take longer to recover from the March 2008 spinal fusion than the three or four months estimated by Dr. Martin.  AR 964, 966. The information included an APS dated July 11, 2008, by then treating-neurological surgeon Dr. Martin ("APS No. 2");[6] an APS dated December 2008 by then treating-psychiatrist Dr. Nayan Patel ("APS No. 3");[7] and an APS dated November 17, 2009 by then-treating orthopedic surgeon Dr. Ralph Rashbaum

---

[6] AR 1924-25 (APS No. 2); AR 965 (noting "APS [No. 2] and MR [medical records] received from Dr. Martin.").

[7] AR 1918-19 (APS No. 3).

("APS No. 4").[8]

In response to her complaints of pain, Plaintiff's then-treating physicians confirmed Plaintiff's spinal fusion was healing properly and becoming solid and that her spine was structurally sound.  They identified the cause of the pain as hardware inserted during the March 2008 spinal fusion that had loosened, then, a possible dysfunction in the sacroiliac joint (SI), and finally, nerve damage.  *See* AR 955 (note from September 21, 2009, "CT results showed structurally the back was fine and the fusion was solid" but there was still pain that could be residual damage to the nerves from the hardware hitting the nerve or the original injury and further noting if it was nerve damage it could take 12-18 months to resolve "if at all"); AR 956 ("Saw Dr. Bosita [then-treating neurosurgeon] on 04/09/2009. xray revealed back looked good, but still experiencing pain. . . . Went to Texas Back Institute on 06/01/2009 and revealed she had permanent nerve damage from the screws."); AR 961 (note from February 12, 2009, "[Plaintiff] called to say she saw Dr. Bosita [then-treating neurosurgeon] today. an xray was done. the fusion getting more solid."); *see also* AR 824, 1429 (December 2008 x-rays); 2208 (referencing June 2009 MRI of lumbar spine); 2211-2212 (August 2009 CT of lumbar spine); AR 963-64; 2215-2218 (July 16, 2009 sensory nerve conduction study) (revealing "reduced recruitment and an increased proportion of high amplitude long duration MUAP's in the bilateral L5 myotomes").

Plaintiff's then-treating physicians prescribed joint injections to treat the SI dysfunction (she received the injections in November and December 2008); physical therapy; and surgery to remove the loosened hardware (she underwent the surgery in March 2009).  AR 1992-97 (Letter dated January 19, 2010). Plaintiff still complained of pain.  Between July 2008 and February 2010,

---

[8] AR 1916-17 (APS No. 4)

Plaintiff updated Hartford regarding her recovery. During the calls and in the written communications, Plaintiff reported she was experiencing debilitating pain that prevented her from sitting, standing, and/or walking for any appreciable period of time.  AR 949-50 (February 2010 call); 951 (December 2009 call); 952 (November 2009 calls and voicemail); 953-54 (October 2009 call); 955 (September 2009 calls); 961-62 (April 2009 call, February 2009 call and voicemail); 963 (December 2008 call); 964-65 (October 2008 call); 966 (July 2008 call); 1940-43 (questionnaire dated April 28, 2009); 2010-12 (Letter dated July 22, 2009); 2007-09 (Letter dated October 19, 2009); 1992-97 (Letter dated January 19, 2010).

Still complaining of pain, Plaintiff next sought treatment with Ralph F. Rashbaum, M.D.  AR 2236. A June 1, 2009 consultation note with Dr. Rashbaum at the Texas Back Institute revealed Plaintiff had been having problems for eight years and was no longer able to walk for any distance or even shop.  AR 2236.  Plaintiff had a spinal cord stimulator implanted in December 2009 to help alleviate her pain.[9]  AR 2237.  Dr. Rashbaum's January 2010 record indicated Plaintiff was getting too much stimulation in her low back.  AR 2237.  The assessment included chronic pain, "failed back surgery syndrome, status post spinal cord stimulator and peripheral ANS stimulator."  AR 2237. Plaintiff was taking four to five pain pills a day and four gabapentin per day.

By February 18, 2010, Plaintiff was still rating low back pain at a 7/10 sometimes approaching 10/10; leg pain 6/10 also approaching 10/10; and midback pain 5/10 that could escalate to 10/10.  AR 2239.  As before, Plaintiff produced "very specific charts and diagrams depicting her pain levels given various activities."  It was noted Plaintiff was "always very cooperative with the

_____

[9] The spinal cord stimulator eventually caused an increase in Plaintiff's symptoms, and Dr. Rashbaum surgically removed it in December 2012.  AR 1802-03.

exam and very gracious in her approach to her chronic pain condition." AR 2239.  Plaintiff felt the

permanent implant was not as effective as a trial device she had previously tried, and Dr. Rashbaum

explained that it was doing everything that it could and that she still needed to "use every tool that

she [could] to try to improve her life and reduce her pain." AR 2239.  Although Plaintiff was

managing on Norco "anywhere from 5 to 6," it was not "really accomplishing what she need[ed] for

it to" so Dr. Rashbaum had a "long hard conversation" with Plaintiff.  Specifically, Dr. Rashbaum

advised Plaintiff as follows:

> [S]he probably does need to try a class II medication. . . . I have told her in the past
> that she will more than likely always be on some form of pain medication, she
> wanted to avoid class II if possible. I think we have exhausted every other procedure
> and modality to try to prevent that. I am referring her now to Dr. Bernstein to see if
> he can find the right medication mix to help reduce her pain so that she can be more
> active.  She wants to do so much, but is very limited physically.  I have also provided
> her with a prescription for handicap parking placard that she can use.  I think she
> pushes herself so far that she has been in such extreme pain that she is bedridden for
> 2 to 3 days.

AR 2239.

Plaintiff's care then transitioned to pain management physician Dr. Sidney Bernstein at the

Texas Back Institute.  AR 949 (Hartford noting it was unexpected Plaintiff would have the capacity

to perform full time work on a regular basis due to inability to sit, stand or walk for minimum

periods). Hartford continued to pay Plaintiff benefits through the end of the "Own Occupation"

period on April 23, 2010.[10]

---

[10] During this same period of time, Plaintiff reported in early October 2008 that her position
at Gambro was given away, meaning when she was ready to return to work, she would have to
reapply. AR 965. In April 2009, Plaintiff reported she had been awarded social security disability
benefits. AR 959, 961, 1361, 2059.

**E.      The April 24, 2010 change of definition of "disabled"**

Given the LTD Claim was effective April 24, 2008, the definition of "disabled" changed

under the Policy on April 24, 2010, from "Own Occupation" to "Any Occupation."  AR 1030-31

(Letter dated October 29, 2009).  Thus, Plaintiff was only entitled to LTD benefits beyond April 24,

2010 if she was unable to perform the essential duties of any occupation.  *Id.*

**F.       Hartford's information regarding Plaintiff's functional capacity**

To determine whether Plaintiff would be capable of performing any occupation, in October

2009 Hartford began to gather medical information regarding Plaintiff's functional capacity.  AR

952. As requested, Dr. Rashbaum provided APS No. 4, which stated Plaintiff could not reach or

perform fingering or handling.  He provided no restrictions or limitations for sitting, standing, or

walking.  AR 1916-17. Hartford asked Dr. Rashbaum to specify his opinion on Plaintiff's ability to

sit, stand, and walk.  AR 944-45. Dr. Rashbaum sent an APS dated March 12, 2010, but it also

provided no specific assessment of restrictive limitations, and instead annotated "Patient Unable to

Work."  AR 1914-15 ("APS No. 5").

Dr. Rashbaum later provided an APS dated April 20, 2010.  AR 1909-10 ("APS No. 6"). APS

No. 6 explained that Plaintiff could frequently reach at desk level and lift/carry up to ten pounds, but

sitting, standing, or walking were all limited to fifteen or twenty minutes at a time, up to four hours

total.  AR 1909-10, 1912-13. On April 20, 2010, Dr. Rashbaum's office clarified that Plaintiff's

functional capacity was limited to four hours a day.

On April 22, 2010, Hartford conducted an employability analysis (the first "EAR"), which

evaluated whether there were any occupations Plaintiff was capable of performing based upon her

functional capabilities as specified by Dr. Rashbaum in APS No. 6, education (Bachelor of Science

11

in microbiology), training, and work history, and which would meet the earnings requirement in the

Policy.  AP 938-40, 1926-33. The EAR identified no occupations.  AR 940, 1927.

## G.      Hartford continued to pay benefits

On April 22, 2010, Hartford calculated the product of Plaintiff's indexed pre-disability

earnings and her benefit percentage to be $3,974.52 per month.[11]  AR 937.  It was further noted

Plaintiff had chronic pain which radiated down the leg which may be due to nerve damage.  AR 937.

It was noted Plaintiff had been referred to Dr. Bernstein with chronic low back pain and leg pain.

Hartford determined as follows:

> Based on the history of the clmt's multiple back surgeries, continued treatment for
> severe back pain and in to her legs (including class II meds and spinal stimulator) it
> is likely clmt would be unable to participate in any type of work activity on a full
> time basis. Clmt's level of medication and need to be bed-ridden for multiple days
> at a time would impact even limited activity and would be unable to sustain full time
> work.

AR 941.

Hartford determined Dr. Rashbaum's opinion on Plaintiff's functional capacity was

supported by the medical records to date and was reasonable, especially considering Plaintiff was

still dealing with the pain she claimed was caused by the spinal cord stimulator and had only begun

to work with Dr. Bernstein "to reduce pain level and maintain some stability" using class II drugs

for pain management.  AR 937-38. Finding Plaintiff was incapable of performing the essential duties

of any occupation because she could not sit, stand, or walk for longer than fifteen or twenty minutes

---

[11] By December 8, 2016, inflation caused Plaintiff's gainful wage to increase to $4,171.55 per month.  AR 869.  According to Plaintiff, under the terms of the Policy, she is entitled to a monthly benefit of $1,805.02, after an offset for her SSDI benefit. This benefit is scheduled to continue until March 14, 2034. Docket Entry # 15 at 5.

at a time and for only up to four hours a day, Hartford determined Plaintiff was disabled under the "Any Occupation" definition of disability and she was entitled to benefits on and after April 24, 2010.  AR 940, 1029 (Letter dated April 29, 2010).

Hartford continued to periodically review the LTD Claim as Plaintiff worked with Dr. Bernstein, who was "switching the medications to see what works best."  AR 935.  Between November 2010 and July 2015, Plaintiff routinely updated Hartford regarding the status of her pain management with Dr. Bernstein. When Dr. Bernstein retired in December 2011, Plaintiff updated Hartford with records from Dr. Noor Gajraj.[12]  Plaintiff explained the different medication combinations she tried and how she reacted to each medication.  She also advised the spinal cord stimulator was removed in December 2012 because it was ineffective. AR 1817-1823 (March 17, 2014 questionnaire) at 1818.  Plaintiff reported that medications did little to alleviate her pain.  AR 935.

Dr. Bernstein and Dr. Gajraj corroborated Plaintiff's statements in APS dated December 3, 2010 by Dr. Bernstein ("APS No. 7"), APS dated October 31, 2012 by Dr. Gajraj ("APS No. 8"), APS dated March 19, 2014 by Dr. Gajraj ("APS No. 9"), and APS dated July 10, 2015 by Dr. Gajraj ("APS No. 10").  AR 1905-06 (APS No. 7), AR 1848-49 (APS No. 8), AR 1798-99 (APS No. 9), and AR 1752-53 (APS No. 10). In the most recent APS No. 10, dated July 10, 2015, Dr. Gajraj listed Plaintiff's primary diagnosis as lumbar degenerative disc disease and her secondary diagnosis as lumbar radiculopathy.  AR 1752-53.  He listed her medications as Dilaudid and Fentanyl and her

---

[12] AR 935-36 (November 2010 call); 932-33 (December 2010 call); 929-30 (January 2011 call); 920-21 (June 2011 call); 1850-54 (November 4, 2012 questionnaire); 1838-39 (Fax dated November 5, 2012); 1817-1823 (March 17, 2014 questionnaire); 1824-1830 (Fax dated March 24, 2014); 1785-91 (July 13, 2015 questionnaire); 1777-78 (Fax dated July 14, 2015).

current subjective symptoms as right sided low back pain and right leg pain and tenderness.  AR 1752.  He opined Plaintiff could walk, stand, and sit for fifteen to twenty minutes at a time and for no longer than four hours per day.  AR 1753.  Dr. Gajraj also stated he did not believe Plaintiff was competent to direct the use of her claim proceeds.  AR 1753.

> On February 20, 2011, Hartford management reviewed Plaintiff's claim and noted:

> [Plaintiff] continues with chronic lower back and leg pain. Dr. Bernstein is managing her medications and making adjustment to help better control [her] pain. [She] is also having side effects from the meds and her weight is also of concern. . . . Although Dr. Bernstein notes that [Plaintiff] has the capacity to lift up to 10 lbs. frequently and up to 20 lbs. occasionally and able to frequently fingering and handling, due to chronic intractable pain she is limited to 15-20 minutes sit/stand/walk for no more than 4 hrs/day. Therefore, it is reasonable that [Plaintiff] would be unable to sustain fulltime any occ[upation] activities.

AR 926.

On June 4, 2011, Hartford determined that, due to her medical history of multiple failed back surgeries and her continued need to take class II medications, "it was likely [Plaintiff] would be unable to participate in any type of work activity on a full time basis."  AR 922. It was further noted that Plaintiff's level of medication and need to be "bed-ridden for multiple days at a time would impact even limited activity and would be unable to sustain full time work."  AR 922.  In her June 8, 2011 call, Plaintiff noted Dr. Bernstein had increased her Fentanyl medication, but she still experienced pain in her right lower back where she has "damaged nerves." AR 920-21. Plaintiff further noted her medications affected her – she was not as coherent as before; her memory was not as good; and she had a hard time remembering things.  AR 921.

The following week, Hartford determined it would try to close Plaintiff's claim by offering her a lump sum settlement.  AR 922. On June 17, 2011, Hartford offered Plaintiff a lump sum of

$165,300.00 to settle her claim. AR 926-27. Plaintiff did not respond to the offer.  AR 919.

**H.     Further investigation into Plaintiff's functional capacity**

Over the years, Hartford has placed Plaintiff under video surveillance by its Special Investigative Unit ("SIU"). Extensive surveillance was performed in 2008, 2009, and 2011. In February and March 2011, SIU investigated the LTD Claim because of inconsistencies between Plaintiff's self-reported functionality during a January 2011 call and Dr. Bernstein's opinion of Plaintiff's functionality in APS No. 7. AR 1302-06 (2011 SIU Case Report) at 1303-04. Hartford also noted Plaintiff's claims of cognitive impairment seemed at odds with the highly detailed communications she sent to Hartford about her condition. AR 1302.

When Plaintiff was observed outside in April of 2011, she walked in a slow manner and "with her hand rubbing her low back area."  AR 1306.  On May 10, 2011, it was noted there had been no inconsistencies or evidence of fraud or misrepresentation.  AR 1306. Hartford's SIU closed its file on Plaintiff after determining the evidence it gathered warranted no additional involvement. AR 922.

In July of 2015, Plaintiff reported increased lower back pain for the previous eighteen months. AR 912. On July 17, 2015, Hartford determined it was unreasonable to expect Plaintiff to return to full time gainful employment, noting the findings contained in APS 10 dated July 10, 2015 by Dr. Gajraj.  AR 912.  It was noted Plaintiff was only forty-eight years old and remained disabled, and the benefit end date was listed as 3/13/2034. AR 912-13. Hartford noted its Risk Management resources had been exhausted and that Plaintiff's claim was again referred to LSS (lump sum settlement). AR 913.

A Hartford manager, however, determined a lump sum settlement offer should be deferred

due to Plaintiff's cognitive decline and the possibility she would be getting a divorce.  AR 913-14.

Specifically, the manager concluded:

> Clmt reports significant memory issues d/t class II narcotics she is taking for pain relief. Clmt state[s] she is unable to remember things well, has times when there is a spike in her Fentanyl patch that causes her to feel dizzy, nauseous and 'loopy.' Clmt reports she does not drive at all. Clmt states she has a hard time remembering specific dates, numbers, what happened on certain dates and that her husband is tired of being her caretaker. **LSS would not be appropriate based on Clmt's cognitive decline** and her reports that she may be getting a divorce.

AR 913-14 (emphasis added).

In April 2016, Hartford reassigned Plaintiff's claim to a Specialty Analyst and changed her Continuing Ability Review ("CAR") level.  AR 909.  Hartford again referred Plaintiff's claim to its SIU, but noted that if SIU again closed its file without need for further review, the Specialty Analyst would review the claim to determine if additional claim management was needed; if no additional claim management was needed, the Specialty Agent would determine Plaintiff's appropriate CAR level. AR 909.

According to Hartford, SIU again investigated the LTD Claim because of inconsistencies between Plaintiff's self-reported functionality in the July 13, 2015 claimant questionnaire ("questionnaire"), Dr. Gajraj's opinion on Plaintiff's functional capacity in APS 10, and Plaintiff's Internet postings showing actions inconsistent with her claimed limited functionality (*i.e.*, attending two concerts (one in 2012 and another in 2015) and references to knitting).  AR 1307-19 (2016 SIU Case Report); 1752-53 (APS No. 10); AR 1140-42 (Etsy profile); 1143-92 (pages from Plaintiff and Plaintiff's husband's Facebook profile) at 1143, 1145, 1154-55 (Dave Matthews Band concert); 1218-23 (Instagram profile); 1226-27 (Patreon profile).

In the questionnaire, which was also Plaintiff's most recent communication to Hartford at

that time, Plaintiff told Hartford that her pain was increasing, not decreasing, and that she could not sit for longer than thirty minutes a day or stand for longer than ten minutes.  AR 1785-91 (July 13, 2015 questionnaire) at 1786-87. According to Hartford, in APS No. 10, Dr. Gajraj stated Plaintiff was capable of sitting, standing, and walking for fifteen to twenty minutes at a time and up to four hours a day.  AR 1752-53 (APS No. 10).

Hartford sought video surveillance for a third time to obtain updated information about Plaintiff's functionality.  Hartford also obtained updated medical records, an in-person interview of Plaintiff, and an independent medical examination. AR 1307-19 (2016 SIU Case Report) at 1309, 1311-13.

### Video surveillance

Surveillance of Plaintiff took place on April 29-30, 2016, May 6, 2016, and June 8-9, 2016. AR1071-80 (Report of April and May 2016 Video Surveillance); 1048-55 (Report of June 2016 Video Surveillance). Plaintiff was not observed during the April and May dates, so surveillance was re-attempted in June. AR 1311.

On June 8, 2016, Plaintiff "was observed breaking down several large cardboard boxes" and "placing them into recycling and trash bins." AR 1048-55 (Report of June 2016 Video Surveillance) at 1052; AR 1311.  To do this, Plaintiff "bent at the waist multiple times, used both hands, arms, shoulders, neck, back, and both legs to press down and compress boxes; then lifted them and deposited them into the bin." *Id*.  Plaintiff was also observed moving the bins to different locations. *Id*.  According to Hartford, Plaintiff was observed performing activities she claimed she could not do in the questionnaire dated July 13, 2015, without any noted stress or exertions. AR 904.

In the questionnaire, Plaintiff described her functionality as follows:

17

> I will get up in the morning. I may shower and only do that every other day or every few days in the winter and try to shower every day in the summer if pain is permitting. In the morning; I will watch TV, read magazines or books or check email for a few minutes, or knit or crochet, talk on the telephone to my Mom every few days . . . . I will do the same type of activities in the afternoon. I do not do anything to hurt myself. I may run the iRobot© vacuum to help clean, but that is all. I may dust with a rag, but not much. My husband does the majority of cleaning tasks. He cooks the meals for us. I am very limited because if I do try to vacuum the floor or mop the floor, it will cause me severe pain and I will pay for it for the rest of the day and maybe for a few days.

AR 1785-91 (July 13, 2015 questionnaire) at 1787.

Hartford sent Dr. Gajraj a copy of the surveillance and asked whether it impacted his opinion on Plaintiff's functionality. AR 903 ("Contact Dr. Gajraj and provide the video summary, the video, interview and statements of disability, and request a response in relation to the claimant's current functional abilities."). Dr. Gajraj never responded.  AR 895 (noting response to video surveillance from Plaintiff's treating gastroenterologist but none from Dr. Gajraj after "numerous attempts at follow up").

### *Updated medical records*

In June 2016, Hartford received updated medical records from Dr. Gajraj for six office visits between February 17, 2015 and May 6, 2016.  AR 1740-49. In each record, Plaintiff's chief complaint was right-sided low back pain and right leg pain. In each record, Dr. Gajraj wrote that "[Plaintiff] is taking her medication as prescribed without significant side-effects and is gaining benefit in terms of analgesia and increased function." AR 1742-46, 1749. In each record, Dr. Gajraj also wrote that a review of her central nervous system found her to be "alert, oriented, no signs of excessive sedation," "[g]ood remote memory," "[a]dequate attention span and able to concentrate." *Id.* Each record also noted Plaintiff's chief complaint remained "right-sided low back pain and right

leg pain." *Id.*  The assessment in each record was lumbar degenerative disease/radiculopathy.  *Id.*

During this time, Dr. Gajraj obtained one objective medical test, a Sudoscan on May 14, 2015, to detect peripheral neuropathy (damage to the peripheral nerves). AR 1747-48 (Sudoscan Report). Plaintiff's Sudoscan found possible early signs of peripheral autonomic neuropathy.  AR 1747.  Despite Dr. Gajraj's intent to retest Plaintiff on Sudoscan, Plaintiff declined a retest. AR 1742-44.

Hartford also received records from Plaintiff's treating gastroenterologist, David Park, M.D., for office visits in April 2015 and May 2016. AR 1633-59.  On May 10, 2016, Plaintiff reported she was still on pain medications for her chronic pain.  AR 1633.  Plaintiff also reported symptoms of back and joint pain. AR 1634, 1641.

### In-person interview

In light of Plaintiff's observed activity during the video surveillance in June 2016, Hartford requested an in-person interview with Plaintiff to further evaluate her condition. AR 1312.  On July 1, 2016, Plaintiff was interviewed at her residence from 12:57 p.m. until 2:00 p.m.  AR 901; AR 1262-1294 (Transcript of In-Person Interview). During the interview, Plaintiff explained she had pain in her lower back on both sides, and down both legs, prior to her first surgery; although the pain in her left side improved following surgery, the pain in her right side did not improve at all. AR 1264. Plaintiff stated she had more surgeries, including a spinal cord stimulator placed in the spot on her left side where she had scar tissue and damage.  According to Plaintiff, that aggravated the scar tissue and made her left side worse again; it was removed in 2012 because it did not help her lower back pain, which was the most "intense part."  AR 1364.

The interviewer acknowledged Plaintiff was living with pain "probably 100% of the time,"

but he wanted to address her functionality. AR 1267. Plaintiff stated she could walk around the grocery store for about thirty or forty minutes. AR 1268. Plaintiff further stated she has more pain in her right leg and foot and had been "starting to fall a lot over. . . from [her] right foot." AR 1268. At the time of the interview, Plaintiff maintained she was basically homebound. AR 1269 ("I'm here at the house by myself. I don't have a car. I don't drive. If I go out . . . if I have to go to the doctor, my husband takes me or my mother will come take me."). She also stated she could sit for an hour on a cushioned seat and fifteen minutes on a hard seat; occasionally grocery shop when her husband was with her; carry up to eleven pounds; and bend forward at the waist to pick up something from the ground. AR 1268, 1272-73, 1280. Plaintiff stated she can do simple, easy straightening up and cleaning inside the house, and she can take out light but not heavy trash. AR 1285-86.

Plaintiff explained she has good days and bad days. The Fentanyl patch, which helps mask a lot of her pain, lasts two days. AR 1283-84. After she changes the patch on the second day, she experiences more pain because "it takes a while for it to get back up to a certain level for [her] to feel like [she] can move a little bit better, you know, to kind of get over that pain." AR 1283. Plaintiff stated the medications make her memory fuzzy, and she has to write things down. AR 1289.

In the summary of the in-person interview, the investigator stated that Plaintiff "walked with a smooth but slow stride, bent over posture and shuffling style gait." AR 1607. Plaintiff did not spontaneously report any pain in walking "but exhibited a noticeable difficulty in walking." AR 1607. When Plaintiff stood, she did so with her weight evenly distributed upon her feet, but her "upper body was bent forward as if she was resting on a walker." AR 1607. Plaintiff "sat forward on the couch leaning on a pillow in her lap the entire interview" and advised the interviewer "she had just changed the Fentanyl patch and the medication had not absorbed and started blocking the

20

pain." AR 1607.  Plaintiff displayed a "bent over posture" when standing, walking, and sitting; "[s]he slumped forward when walking and she leaned forward on a pillow when sitting." AR 1608. Throughout the entire interview, Plaintiff complained of pain in her lower back.  She did not display any objective signs of cognitive impairment or lack of focus in the presence of the interviewer.  AR 1608.

On July 19, 2016, Hartford's SIU completed its investigation and found no evidence warranting continued investigation.  AR 900.  Its investigator wrote Plaintiff to advise her she had been under surveillance, but that no more was planned.  AR 999.  The claim notes contain an entry from the SIU investigator dated a week after she notified Plaintiff that the investigation was closed, stating the pervious note should be disregarded and the SIU investigation was continuing.[13] *See, e.g.* AR 899.

### *Independent medical examination*

On August 30, 2016, the Specialty Analyst wrote Plaintiff and advised her she was required to attend an independent medical examination ("IME").  AR 995-96.  Hartford sought further clarification on Plaintiff's back pain issues by obtaining an IME through independent third-party vendor, Medical Consultants Network.  AR 895-96 (noting "an additional opinion is needed to clarify the claimant's current maximum level of functional ability. . . unable to get an opinion from the pain mgmt. provider.").

After receiving the letter, Plaintiff called the Specialty Analyst and explained that traveling from her home in McKinney, Texas to the IME doctor's office in Arlington, during rush hour traffic,

---

[13] There is no explanation for the change, and the claim notes do not reveal any further, direct SIU activity. Neither is there any indication Plaintiff was notified to disregard the letter SIU had previously sent.

would take at least two hours. She explained she could not physically tolerate this length of car trip and asked if she could attend an IME with another doctor closer to her home.  AR 889.  The Specialty Analyst stated she would try to confirm whether that IME vendor was closest to Plaintiff's home.  *Id*.  Hartford ultimately scheduled the IME with Board Certified Physical Medicine and Rehabilitation physician John Sklar, M.D., in Fort Worth. AR 878-79 (scheduling IME with Dr. Sklar).

Plaintiff and her husband traveled to Fort Worth and stayed in a hotel the night before the exam to ensure she could attend the IME the next day.  AR 877. Dr. Sklar performed the examination and prepared a report of his findings and opinion dated October 20, 2016 (the "IME Report").  AR 1528-30 (IME Report).  According to Dr. Sklar, a 2009 MRI revealed Plaintiff had a "problem with pain out of proportion to any known structural abnormalities." AR 1529. On physical examination, Dr. Sklar noted Plaintiff walked with a forward flexed posture holding her back, with a "fairly normal" gait. AR 1529. He also noted there were multiple healed scars over the lumbar region and decreased sensation in the bilateral lower extremities especially in the S1 distribution.  "Straight leg raising to 90 degrees in the seated position cause[d] complaints of back pain only." AR 1529.  There was moderate tenderness to palpation over the lumbosacral junction and bilateral gluteals and left lateral thigh/greater trochanter region.  The physical examination was consistent with the diagnosis of chronic unspecified lower back pain, but there was no "clear evidence of any persistent radiculopathy and records [were] not consistent with the diagnosis of chronic radiculopathy either." AR 1529.

Hartford had asked Dr. Sklar whether, given the totality of the medical evidence and other information provided, he felt there are any restrictions or limitations as to Plaintiff's activity, and if

so, would she be capable of performing activity up to forty hours per week with these restrictions. AR 1530.  In response, Dr. Sklar opined Plaintiff could work a light or sedentary occupation up to forty hours a week with the following restrictions and limitations based on her chronic pain condition and "[t]o accommodate her pain:" ability to change positions on an as needed basis with up to six hours per day of sitting and the rest of the day spent in a combination of standing and walking for up to two hours; occasionally lifting up to twenty pounds; and no repetitive bending or twisting.  AR 1530. Dr. Sklar explained the restrictions and limitations were in line with industry standards.  *Id.*

Dr. Sklar further stated as follows:

> This claimant has pain. Pain is clearly not a reason not to work and the evidence based medical literature suggests that persons with chronic pain are actually well served by engaging in normal life activities especially work.
>
> Work then is not only reasonable here it would be a part of the claimant's reasonable treatment plan to treat her pain complaints. I make these recommendations then in the claimant's best interest. It would be predicted that if she continues on an off-work status her situation will continue to deteriorate and returning to work is the one intervention which would actually be expected to stop that deterioration from occurring.

*Id.*

After reading the report summarizing the June 2016 video surveillance (he could not get the surveillance video to play), Dr. Sklar noted Plaintiff was observed putting things in a trash bin, activities which seemed to be "fairly vigorous" and "demonstrate [Plaintiff] having functional capabilities consistent with those [Dr. Sklar] outlined above **at least for a brief period of time**." AR 1530 (emphasis added). After viewing the surveillance, Dr. Sklar confirmed on November 8, 2016 it did not change his opinion regarding Plaintiff's functionality. AR 1525.

Hartford provided the IME Report to Dr. Gajraj and asked if it impacted his opinion on

Plaintiff's functionality.  AR 872 ("MCM to send copy of IME report to Dr. Gajraj and allow 15 days for a response."); 994 (Letter dated Nov. 9, 2016 transmitting copy of IME Report to Dr. Gajraj and asking for his comments regarding same).Dr. Gajraj did not respond.  AR 870 ("Copy of IME report sent to Dr. Gajraj no response").

## I.    First EAR Addendum

The Specialty Analyst commissioned a new employability analysis report from Hartford's in-house vocational consultant.[14] AR 870. The consultant was specifically instructed to consider the function opined by Dr. Sklar (that Plaintiff could work forty hours per week, sit six hours per day, and stand and walk two hours per day, with no repetitive bending or twisting) and determine if the updated function would "alter the outcome of the [first] EAR completed on 4/22/10." AR 1508. On December 8, 2016, Hartford updated the first EAR using Dr. Sklar's restrictions and limitations in the IME Report (the "First EAR Addendum").  AR 1508-09.

Unlike the first EAR, the First EAR Addendum identified several occupations Plaintiff was well-suited for based on her education, training, and work history, and which met the earnings requirement in the Policy (*i.e.*, quality-control coordinator, administrative assistant, director of research and development, consultant, project direction, executive secretary).  AR 1511-12. Essentially, the First EAR Addendum found Plaintiff could return to her former occupation, or a similar occupation.  AR 1508-09; 1513-19 (as one example, the executive secretary or executive administrative assistant occupation identified is described as providing "high-level administrative support" and also training and supervising lower-level clerical staff).

---

[14] The previous EAR had determined there were no jobs Plaintiff could perform that would pay a gainful wage under the policy criteria.  AR 1926-27.

**J.      Hartford terminated LTD benefits effective December 15, 2016**

On December 15, 2016, Hartford notified Plaintiff that because her physical functionality had improved such that she was capable of performing the essential duties of "Any Occupation," she no longer met the definition of disability under the Policy beyond December 14, 2016.  AR 985-92 (Letter dated December 15, 2016). Thus, she was not eligible for and would not receive benefits as of December 15, 2016. AR 985. In its denial letter, Hartford explained its denial, in pertinent part, as follows:

> Although the medical information previously submitted was determined to support Disability from Your Occupation and from Any Occupation, the totality of the information on file to include the medical records, the surveillance footage, the information reported during the in-person interview, and the information compiled during the Medical Case Manager review has changed our assessment of your physical functionality.
>
> We have concluded from the combination of all the medical information in your file that you are able to perform full time work within the restrictions and limitations provided by Dr. Sklar.

AR 990.

Hartford pointed to the June 2016 video surveillance that captured Plaintiff breaking down boxes and the in-person interview where she allegedly admitted to being more active and capable of much more activity than she had reported to Hartford in the past.  AR. 988-89. Hartford also explained that it considered the most recent medical records from Dr. Gajraj, and specifically referenced the record from a May 6, 2016 office visit that noted "Plaintiff had analgesia" and "increased function" on her medications. AR 988. Hartford summarized the IME Report, specifically Dr. Sklar's findings and opinions that Plaintiff was capable of working in a sedentary or light occupation up to forty hours per week with specified restrictions and limitations.  AR 989-90.

Hartford noted Dr. Gajraj had yet to respond to Hartford's requests for his comment on the IME Report. AR 990.

Hartford concluded by briefly reciting the occupations identified in the First EAR Addendum that Plaintiff could perform.  AR 990-91.  Hartford referenced the First EAR Addendum to contend Plaintiff could return to high-level positions paying six-figure salaries, such as Project Director, or Director, Research and Development. AR 990.

### K.    Plaintiff's appeal

On June 7, 2017, Plaintiff, through counsel, appealed Hartford's decision to terminate Plaintiff's LTD benefits. AR 1388-98 (Letter dated June 7, 2017). According to the letter, Hartford's stated justification for the denial of Plaintiff's benefits (video surveillance, in-person interview, and information compiled during Hartford's Medical Case Manager Review) was disingenuous, noting there was no inconsistency that justified Hartford's reversal regarding Plaintiff's claim.  AR 1388-89. Plaintiff's counsel argued Dr. Sklar failed to consider Plaintiff's complaints of pain and made no mention in his report of the cognitively impairing effects of Plaintiff's required medication.  AR 1396. Counsel also referenced the 2009 opinion of medical consultant for the Social Security Administration, Teresa Fox, M.D., that Plaintiff's alleged limitations caused by her symptoms were supported by medical and other evidence of record.[15]  AR 1396-97.

---

[15]  Dr. Fox opined as follows:

Clmt has had chronic pain since original surgery and despite ongoing medical management, including surgery. In addition, clmt has had pain management (including ESI's) and multiple pain medications. Consideration was given for spinal cord stimulator. Currently, clmt uses hydrocodone during the day for pain and OxyContin for nighttime/sleeping….
Alleged limitations caused by claimant's symptoms are supported by medical and other evidence of record.

Plaintiff's counsel submitted the following documents with the appeal: (1) an entire copy of the Social Security Disability file on a CD (AR 462-760);[16] (2) updated records from treating primary care doctor Purvi Sanghvi, M.D., for October 2016 and December 2016 (AR 1-8); (3) updated records from treating pain management doctor Dr. Gajraj for the period of August 2016 to May 2017 (AR 9-13); (4) letter from Dr. Gajraj dated June 6, 2017 (AR 14); and (5) a medical log prepared by Plaintiff (AR 15-47).

In October 2016, Plaintiff established primary care with Premier Care Internal Medicine in McKinney, Texas.  AR 6.  According to Dr. Sanghvi, Plaintiff reported that due to severe back pain she had been seeing a pain management specialist for the past four years.  It was also noted that Plaintiff reported being forgetful and having to write "everything down due to her being on high dose narcotics."  AR 6.  The assessment included chronic pain syndrome and Celiac disease.  AR 6.

In each record from her pain management physician from August 2016 to May 2017, Dr. Gajraj wrote that Plaintiff was still complaining of low back and right leg pain.  AR 10-13. It was further noted that "[Plaintiff] is taking her medication as prescribed without significant side-effects and is gaining benefit in terms of analgesia and increased function."  AR 10-13. In each record, Dr. Gajraj also wrote that a review of her central nervous system found her to be "alert, oriented, no signs of excessive sedation," "[g]ood remote memory," "[a]dequate attention span and able to concentrate."  *Id.*

---

AR 7542-59.

[16] The majority of the medical records submitted were from 2008 or earlier years.  AR 861. The most recent record in the Social Security Disability file was an office visit note from a February 12, 2009 doctor's appointment; MRI scans from June 30, 2009; and CT scans from August 27, 2009.

In his June 6, 2017 letter, Dr. Gajraj stated as follows:

I am a Board Certified Pain Management doctor and have been [Plaintiff's] treating physician or more than five years.  I am very familiar with her condition.

[Plaintiff] suffers from chronic pain, secondary to lumbar degenerative disc disease/radiculopathy.  Although she is capable of performing limited light tasks, I do not believe she is capable of working in a competitive environment.  Even limited physical exertions cause her to require significant down time.  If she were to attempt to return to even a sedentary work environment, she would require significant time off-task each day.  I believe she could perform no more than 2-4 hours of work per day.  She additionally requires the fentanyl patch 100 mcg/hr and Dilaudid simply to achieve limited function.  These medications, however can impact cognition and the ability to perform detailed tasks.  I consider [Plaintiff] to be disabled from competitive work.

AR 14.

## L.      Hartford's review of the appeal submission

Hartford documented its review of the appeal submission.  AR 859-61 (appeal review) at 861 ("Additional information submitted for consideration on appeal include the following. . ."); 854-55 ("Receipt of CD Rom submitted by attorney representative contains the following documentation. . .").  Hartford noted Dr. Sanghvi's medical record for an office visit in October 2016 "noted no abnormalities."  AR 854; *see also* AR 6-7.  Dr. Sanghvi's record in December 2016 "noted [Plaintiff] as alert, oriented, cognitive function intact with good eye contact, judgement and insight with good mood/affect," and "[Plaintiff's] muscoskeltal [sic] and neuro evals were [within normal limits] with no abnormalities noted," and noted the visit was a "general adult medical examination without abnormal findings."  AR 854; *see also* AR 2-5.

Hartford also noted the updated medical records from Dr. Gajraj for office visits between 2015 through May 2017 "confirm [Plaintiff] was gaining benefit from her [medication] regimen in terms of analgesia and increased function with no exam abnormalities," and "note [Plaintiff] reports

of doing well overall with no complaints of medication side-effects and increased function."  AR 855, 861. The most recent record from an office visit with Dr. Gajraj on May 5, 2017 "confirmed [Plaintiff] as alert, oriented with no signs of excessive sedation with good remote memory and adequate attention span and concentration."  AR 855.

Hartford found Dr. Gajraj's medical records did not support his opinion in APS No. 10 and letter dated June 6, 2017, in which he opined Plaintiff is only capable of four hours of physical functionality due to debilitating chronic pain associated with lumbar degenerative disc disease and radiculopathy, and that her medication only allowed her to achieve limited function and caused her cognitive impairment.  AR 861; *see also* AR 14 (Letter dated June 6, 2016); 1752-53 (APS No. 10).

## M.     Hartford's peer review

As part of its consideration of Plaintiff's appeal, Hartford obtained a peer review through an independent third-party vendor, Exam Coordinators Network ("ECN"). AR 853 ("Given the discrepancy in the medical evidence exam findings from the claimant's pcp, pain management and IME physician and the claimant's Pain AP opinion on functionality, it is reasonable to submit the claim file documentation for a Pain Management [sic] independent medical review . . . ."). Board Certified Physical Medicine and Rehabilitation and Board Certified Pain Medicine physician Dr. Jamie L. Lewis was identified by ECN to review Plaintiff's medical records and objectively analyze her functionality.  AR 849, 1341-54 (Peer Review). Dr. Lewis' review did not involve a physical personal evaluation of Plaintiff.

On July 19, 2017, Dr. Lewis provided a summary of his findings and opinions (the "Peer Review Report").  AR 1341-54. Dr. Lewis reviewed some of Plaintiff's medical records dating back to February 2008, physical therapy records, attending physician statements, and Dr. Sklar's IME

Report.  AR 1342-43. Dr. Lewis also reached out to Dr. Gajraj and Dr. Sanghvi to discuss their recommendations for restrictions and limitations.  *Id.* at 1348, 1351-53 (noting in Peer Review Report he left "detailed message[s]" for Dr. Gajraj and Dr. Sanghvi and faxed both questions). Dr. Sanghvi responded, and advised that as she had treated Plaintiff for upper respiratory issues, her scope of treatment would not result in restrictions or limitations, and Dr. Gajraj should be consulted for limitations due to pain.  AR 1351-52. Dr. Gajraj did not respond.  AR 1348 (noting in Peer Review Report that Dr. Lewis received no response from Dr. Gajraj).

Based on his review, Dr. Lewis concluded Plaintiff's surgical history and chronic pain issues warranted functional limitations that would likely be "ongoing and indefinite."  AR 1349-50. These limitations proscribed climbing ladders, crawling, walking on uneven ground, or balancing, and they also limited overhead reaching, pushing, pulling, and sitting, standing, or walking. *Id*. Agreeing with Dr. Skylar's IME Report, Dr. Lewis concluded Plaintiff could work eight hours a day, forty hours a week with certain restrictions and limitations: sitting one hour at a time for up to six hours a day, alternating as needed between standing (thirty minutes at a time up to four hours a day) and walking (thirty minutes at a time up to four hours a day).  AR 1349-50. Dr. Lewis observed that Plaintiff's medication regimen of Fentanyl patches and Dilaudid pills provides "functional benefit without evidence of any adverse side effects" and that neurological findings were intact.  AR 1348.

The EAR was again updated using Dr. Lewis' opinion on Plaintiff's functionality (the "Second EAR Addendum").  AR 841-42 (noting adjustment for stooping, kneeling, crouching, and climbing (for stairs only) to occasionally and handling, fingering and feeling to constantly), AR 1323-39.  According to Hartford, Dr. Lewis' opinion on functionality did not "alter the outcome of the [First EAR Addendum]."  AR 842 ("These updates increased the number of identified

occupations from 746 to 852; and will not alter the outcome of the previous EAR in which the following occupations were identified. . . ."); AR 977 ("The Employability Analysis Report (EAR) completed in 12/2016 was based on the IME restrictions and limitations which were not as detailed as those provided by the current pain specialist review and as such an amended EAR was completed on 07/19/2017 without altering the prior outcome or sample identified occupations.").

On July 25, 2017, Hartford advised Plaintiff's counsel that it was upholding its decision to terminate Plaintiff's LTD benefits.  AR 973-78 (Letter dated July 25, 2017). In the letter, Hartford identified the information it considered during its appeal review of Plaintiff's LTD Claim.  AR 973-74. Hartford explained that the most recent evidence showed Plaintiff was capable of working any occupation.  *Id*.  The letter further stated as follows.

Dr. Gajraj's records between February 2015 and May 2017 showed that Plaintiff's medication regimen of Fentanyl patches and Dilaudid pills was adequately managing Plaintiff's back pain with increased benefits in terms of analgesia and increased functional and no significant side effects. AR 974.  Hartford stated the restrictions and limitations and accommodations provided by Dr. Lewis, the reviewing pain specialist, appear reasonable and provide full consideration of Plaintiff's medical and surgical history and chronic pain issues and confirm Plaintiff retains functionality. AR 977. Hartford explained the receipt of benefits from Hartford is determined under a different definition of disability than that used by the Social Security Administration and further stated the SSA's disability determination was a piece of relevant evidence but was not conclusive. AR 977. Hartford stated the SSA does not conduct an analysis of skills that may be transferrable to other occupations, whereas Hartford does a transferrable skills analysis to determine whether an individual's prior experience and skill set would allow her to perform an occupation with minimal

on-the-job training.   AR 977-78. Hartford noted the decision was final and that Plaintiff had exhausted her administrative remedies.  AR 978.

## IV. CONCLUSIONS OF LAW

### A.    Legal Standard

### *ERISA*

"ERISA provides federal courts with jurisdiction to review benefit determinations by fiduciaries or plan administrators." *Bellard v. Unum Life Ins. Co. of Am.*, No. CV 15-0428, 2016 WL 7108577, at *5 (W.D. La. Dec. 5, 2016) (quoting *Estate of Bratton v. National Union Fire Ins. of Pittsburgh, PA*, 215 F.3d 516, 520-21 (5th Cir. 2000) (citing 29 U.S.C. § 1132(a)(1)(B))).   Under ERISA, a plan participant or beneficiary may sue "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132 (a)(1)(B). The parties do not dispute that Plaintiff, as a participant under a qualifying ERISA plan, is entitled to bring this suit under ERISA.

### *FED. R. CIV. P. 52*

Both parties have elected to proceed pursuant to Federal Rule of Civil Procedure 52, under which the Court conducts "what is essentially a bench trial on the record."   *Reetz v. Hartford Life and Accident Ins. Co.*, 294 F. Supp. 3d 1068, 1077 (W.D. Wash. 2018).   Rule 52, which governs actions "tried on the facts without a jury," requires the Court "find the facts specifically and state its conclusions of law separately."   FED. R. CIV. P. 52(a). In the Fifth Circuit, "Rule 52(a) does not require that the district court set out [its] findings on all factual questions that arise in a case." *Koenig v. Aetna Life Ins. Co.*, No. 4:13-CV-0359, 2015 WL 6554347, at *3 (S.D. Tex. Oct. 29, 2015), *aff'd sub nom. N. Cypress Med. Ctr. Operating Co., Ltd. v. Aetna Life Ins. Co.*, 898 F.3d 461

(5th Cir. 2018) (quoting *Valley v. Rapides Parish Sch. Bd.,* 118 F.3d 1047, 1054 (5th Cir.1997)

(citing *Golf City, Inc. v. Wilson Sporting Goods Co., Inc.,* 555 F.2d 426, 433 (5th Cir.1977))). Nor

does it demand "punctilious detail [or] slavish tracing of the claims issue by issue and witness by

witness." *Koenig*, 2015 WL 6554347, at *3 (citations omitted). Rather, a court's "[f]indings [are

sufficient to] satisfy Rule 52 if they afford the reviewing court a clear understanding of the factual

basis for the trial court's decision." *Id.* (citations omitted).

Using Rule 52 is effective in the ERISA context because courts may resolve factual disputes

and issue legal findings without the parties resorting to cross motions for summary judgment. *Tran

v. Minnesota Life Ins. Co.*, No. 17-CV-450, 2018 WL 1156326, at *5 (N.D. Ill. Mar. 5, 2018); *see

also Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir. 1999) (noting "the district court

may try the case on the record that the administrator had before it."). In a trial on the administrative

record, the district judge reviews the evidence to determine "whether [the Plaintiff] is disabled within

the terms of the policy." *Kearney*, 175 F.3d at 1095.  Further, "in a trial on the record, but not on

summary judgment, the judge can evaluate the persuasiveness of conflicting testimony and decide

which is more likely true." *Id.*

### *Standard of Review*

The standard of judicial review afforded benefits determinations depends upon whether a

claims administrator is vested with discretionary authority. A court reviews a plan administrator's

decision *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority

to determine eligibility for benefits;" if the plan does grant such discretionary authority, the court

reviews the administrator's decision for abuse of discretion.[17] *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

In this case, both parties agree to a *de novo* standard of review.[18] *See* Docket Entry #15 (Plaintiff's Motion to Determine the Appropriate Standard of Review, wherein Plaintiff argued she is entitled to *de novo* review); *see also* Docket Entry #16 (Hartford's stipulation to application of the *de novo* standard of review for purposes of this lawsuit in response to Plaintiff's motion).  Under the *de novo* standard of review, the court's task "is to determine whether the administrator made a correct decision." *Niles v. Am. Airlines, Inc.*, 269 Fed. Appx. 827, 832 (10th Cir. 2008) (quoting *Hoover v. Provident Life and Accident Ins. Co.*, 290 F.3d 801, 808–09 (6th Cir.2002)). Hartford's decision to terminate benefits is not afforded deference or a presumption of correctness.  *Id.* at 832; *see also Salve Regina Coll. v. Russell*, 499 U.S. 225, 238 (1991) ("When *de novo* review is compelled, no form of appellate deference is acceptable."). Instead, the court must "independently weigh the facts and opinions in the administrative record to determine whether the claimant has met his burden of showing that he is disabled within the meaning of the policy." *Richards v. Hewlett-*

---

[17] In *Ariana M. v. Humana Health Plan of Tex., Inc.*, 884 F.3d 246, 256 (5th Cir. 2018) (en banc), a majority of the *en banc* court overruled its precedent, *Pierre v. Conn. Gen. Life Ins. Co.*, 932 F.2d 1552 (5th Cir. 1991) (holding challenges to an administrator's factual determination that a beneficiary is not eligible must be reviewed under the same abuse of discretion standard that applies when plans have delegated discretion). In overruling *Pierre*, the Fifth Circuit is now aligned with other Circuit Courts of Appeals which have determined the Supreme Court in *Bruch* mandated that courts apply a *de novo* standard of review to all ERISA benefits determinations regardless of whether the denials under review were legally-based plan interpretations or factually-based eligibility determinations, unless an administrator has discretionary authority. *See Ariana M.*, 884 F.3d at 248, 255.

[18] The Court has not located post-*Ariana M.* cases similar to this one from within this circuit which provide guidance as to the court's task under the *de novo* review standard.  Thus, the Court references law from other circuits.

*Packard Corp.*, 592 F.3d 232, 239 (1st Cir. 2010).

When a court reviews a plan administrator's decision under the *de novo* standard, the burden of proof is on plaintiff to prove she is disabled. *Oliver v. Aetna Life Ins. Co.*, 613 Fed. Appx. 892, 896 (11th Cir. 2015) ("[T]he plaintiff bears the burden to prove that he is disabled."). The burden of proof does not change because a plaintiff qualified at one point in time for disability benefits and the benefits were later terminated when she no longer qualified. *See Muniz v. Amec Constr. Mgmt., Inc.*, 623 F.3d 1290, 1294-96 (9th Cir. 2010) ("the burden of proof continues to lie with the plaintiff when disability benefits are terminated after an initial grant"). The plaintiff bears the burden of proving by a preponderance of the evidence that she is disabled. *Gilewski v. Provident Life & Accident Ins. Co.*, 683 Fed. Appx. 399, 406 (6th Cir. 2017) ("[Plaintiff] must prove by a preponderance of the evidence that he was 'disabled,' as that term is defined in the policy."); *see also Dewsnup v. Unum Life Ins. Co. of Am.*, No. 2:17-CV-00126-TC, 2018 WL 6478886, at *7 (D. Utah Dec. 10, 2018) (citing *Niles*, 269 Fed. Appx. at 833) ("To prevail, a claimant's entitlement to benefits must be supported by a preponderance of the evidence based on the court's review of the record.").

## B.    Application to Plaintiff

### 1.    The issue

Before Plaintiff may prevail on a claim of wrongful termination of benefits, she has the burden of demonstrating by a preponderance of the evidence she is disabled within the terms of the Policy. The parties agree Plaintiff was entitled to receive benefits from April 24, 2008 through December 14, 2016.  This dispute arises from Hartford's termination of those benefits, effective December 15, 2016.

Given she had already received benefits for 24 months, under the terms of the Policy, Plaintiff is "disabled" if she is "prevented from performing one or more of the Essential Duties" of "Any Occupation."  Docket Entry # 17-1 at 25-26.  "Essential Duties" means a duty that "1) is substantial, not incidental; 2) is fundamental or inherent to the occupation; and 3) cannot be reasonably omitted or changed." *Id*. at 26.  Plaintiff's ability to work the number of hours in the regularly scheduled workweek is an Essential Duty.  *Id.*  "Any Occupation" "means any occupation for which [Plaintiff is] qualified by education, training or experience" and that meets an earnings potential threshold in the Policy.  *Id*. at 25. Disability benefits end when Plaintiff is "no longer Disabled." *Id*. at 18.

Therefore, to obtain LTD benefits beyond December 14, 2016, Plaintiff must show by a preponderance of the evidence that she cannot perform one or more essential duties of any occupation for which she is qualified.[19]  Plaintiff can do this by showing she cannot work the number of hours in a regularly scheduled workweek.

2.    *De novo* **review**

As the Court is applying *de novo* review, no deference is given to the claim administrator's decision, and the Court evaluates the persuasiveness of each side's case and determines if Plaintiff has adequately established that she is disabled under the Policy.  *See Houghton v. Hartford Life & Accident Ins. Co.*, No. C16-1186RAJ, 2017 WL 3839577, at *4 (W.D. Wash. Aug. 31, 2017) (citing *Oldoerp v. Wells Fargo & Co. Long Term Disability Plan*, 12 F. Supp.3d 1237, 1251 (N.D. Cal.

---

[19] According to Plaintiff, the two problematic clauses are the requirements that Plaintiff be able to work the number of hours in a regularly scheduled workweek (presumably forty hours) and that she be able to earn an amount equal to the product of her Indexed Pre-disability Earnings and her Benefit Percentage, which amounts to at least $4,171.55 per month.  *See* Docket Entry # 28 at 2-3 (citing AR 869).

2014)).  Based on the record before it, the Court does not believe Plaintiff could perform the essential duties of any occupation for which she is reasonably qualified.  The Court addresses the relevant evidence below.

Plaintiff has suffered from severe back pain since at least 2002, when a diagnostic lumbar discogram revealed severe pathology at her L4-5, L5-S1 intervertebral levels as well as less severe degeneration at her L3-4 level.  AR 507-08.  Plaintiff underwent surgery in 2002 on her L4-S1 levels and improved for a time, but she began to deteriorate in 2004.  AR 521, 533-34.  By 2007, Plaintiff could not sit in a chair, lie in a bed, or stand for any significant length of time.  AR 521.

Plaintiff pursued aggressive surgical treatment with neurosurgeon, Robert Martin, M.D. On March 25, 2008, Dr. Martin performed an extreme interbody fusion at L3-4.  AR 787-89.  In July 2008, Dr. Martin stated Plaintiff could sit for no more than two hours in a day, stand for no more than two hours per day, and walk for no more than two hours per day.  AR 1925.  Dr. Martin further stated these limitations are permanent. AR 1925.

Still complaining of pain, Plaintiff next sought treatment with Ralph F. Rashbaum, M.D.  Dr. Rashbaum diagnosed Plaintiff with "failed back surgery syndrome" and surgically implanted a spinal cord stimulator.  AR 2237.  The spinal cord stimulator eventually caused an increase in Plaintiff's symptoms, and Dr. Rashbaum surgically removed it in December 2012.  AR 1802-03.  Dr. Rashbaum recommended Plaintiff start long-term use of class II narcotics.  In a "long hard conversation," Dr. Rashbaum advised Plaintiff as follows:

> [S]he probably does need to try a class II medication. . . . I have told her in the past that she will more than likely always be on some form of pain medication, she wanted to avoid class II if possible. I think we have exhausted every other procedure and modality to try to prevent that. I am referring her now to Dr. Bernstein to see if he can find the right medication mix to help reduce her pain so that she can be more

37

active.  She wants to do so much, but is very limited physically.  I have also provided her with a prescription for handicap parking placard that she can use.  I think she pushes herself so far that she has been in such extreme pain that she is bedridden for 2 to 3 days.

AR 2239.

Plaintiff's care then transitioned to pain management physician Sidney Bernstein, M.D., at the Texas Back Institute. Dr. Bernstein stated Plaintiff could sit, stand, and walk for fifteen to twenty minutes at a time and could not do any of the postures for more than a total of four hours per day. AR 1905.

On February 20, 2011, Hartford management reviewed Plaintiff's claim and noted:

[Plaintiff] continues with chronic lower back and leg pain. Dr. Bernstein is managing her medications and making adjustment to help better control [her] pain. [She] is also having side effects from the meds and her weight is also of concern. . . . Although Dr. Bernstein notes that [Plaintiff] has the capacity to lift up to 10 lbs. frequently and up to 20 lbs. occasionally and able to frequently fingering and handling, due to chronic intractable pain she is limited to 15-20 minutes sit/stand/walk for no more than 4 hrs/day. Therefore, it is reasonable that [Plaintiff] would be unable to sustain fulltime any occ[upation] activities.

AR 926.

When Dr. Bernstein retired in December 2011, Plaintiff updated Hartford with records from her current pain management physician, Noor Gajraj, M.D. Dr. Gajraj is Board Certified in Pain Management and has treated Plaintiff for more than five years. AR 14.  In the most recent APS No. 10, dated July 10, 2015, Dr. Gajraj listed Plaintiff's primary diagnosis as lumbar degenerative disc disease and her secondary diagnosis as lumbar radiculopathy.  AR 1752-53 (duplicate AR 1783-84). He listed her medications as Dilaudid and Fentanyl and her current subjective symptoms as right-sided low back pain and right leg pain and tenderness.  AR 1752.  He opined Plaintiff could walk, stand, and sit for fifteen to twenty minutes at a time and for no longer than four hours per day.  AR

38

1753.

The record indicates Plaintiff's functional impairments persisted beyond December 14, 2016. There are numerous indications from Plaintiff's physicians, and from Hartford's notations, that improvement is not likely with Plaintiff's condition. *See*, *e.g.*, AR 1925 (Dr. Martin stating in 2008 the limitations are permanent); AR 955 (note from September 21, 2009 that there was still pain that could be residual damage to the nerves from the hardware hitting the nerve or the original injury and further noting if it was nerve damage it could take 12-18 months to resolve "**if at all**") (emphasis added); AR 956 ("Went to Texas Back Institute on 06/01/2009 and revealed she had **permanent nerve damage** from the screws.") (emphasis added); AR 963-64; 2215-2218 (July 16, 2009 sensory nerve conduction study) (revealing "reduced recruitment and an increased proportion of high amplitude long duration MUAP's in the bilateral L5 myotomes"); AR 922 (June 2011 notation by Hartford that due to her medical history of multiple failed back surgeries and her continued need to take class II medications, "it was likely [Plaintiff] would be unable to participate in any type of work activity on a full time basis" and also noting Plaintiff's level of medication and need to be "bed-ridden for multiple days at a time would impact even limited activity and would be unable to sustain full time work").  In May 2016, Plaintiff reported current symptoms of back and joint pain to her treating gastroenterologist, Dr. Park. AR 1634, 1641.

Hartford previously determined Plaintiff could not perform the essential duties of any occupation after the definition of "disabled" changed on April 29, 2010.  Hartford correctly asserts an administrator's past payment of benefits does not "operate forever as an estoppel so that an insurer can never change its mind," but it fails to acknowledge that past payment of benefits can be a consideration in the Court's *de novo* review. *Muniz v. Amec Const. Mgmt., Inc.*, 623 F.3d 1290,

1297 (9th Cir. 2010) (quoting *McOsker v. Paul Revere Life Insurance Co.,* 279 F.3d 586, 589 (8th

Cir.2002)). In *McOsker*, the Eighth Circuit stated that paying benefits does not operate "forever as

an estoppel so that an insurer can never change its mind; **but unless information available to an**

**insurer alters in some significant way, the previous payment of benefits is a circumstance that**

**must weigh against the propriety of an insurer's decision to discontinue those payments**." 279

F.3d at 589 (emphasis added).

In *Saffon v. Wells Fargo & Co. Long Term Disability Plan,* the Ninth Circuit stated that

"MetLife had been paying Saffon long-term disability benefits for a year, which suggests that she

was already disabled." 522 F.3d 863, 871 (9th Cir.2008). The court opined that to find the plaintiff

no longer disabled, "one would expect the MRIs to show an *improvement,* not a lack of

degeneration." *Id.* (emphasis in original). This requirement imposes no burden on the insurer, but

is instead a logical inference that the court may make based on a specific set of facts." *Reetz*, 294

F. Supp. 3d at 1079 (citing *Schramm v. CNA Fin. Corp. Insured Grp. Ben. Program*, 718 F. Supp.

2d 1151, 1162 (N.D. Cal. 2010)).[20]

Here, Hartford paid LTD benefits under the more restrictive definition of "disabled" for over

six years, until December 14, 2016; thus, the Court would expect to see evidence of improvement

in the record.  As an initial matter, the Court notes Hartford's notations indicate Plaintiff's use of

class II medications played into Hartford's decision.  For example, on June 4, 2011, Hartford

---

[20] In *Reetz*, Hartford awarded the plaintiff both short term and long term disability benefits
– for almost two years – on account of her fibromyalgia and back pain, "which strongly suggest[ed]
that she was disabled."  294 F. Supp. 3d at 1079.  The court in *Reetz* expected to see evidence of
improvement in the period of time leading up to the date when Hartford determined Plaintiff was no
longer disabled.  *Id*. at 1079-80.  The court disagreed with Hartford's assertion that the plaintiff saw
improvement in her functionality.  *Id*. at 1080.  According to the court, "the record evinces that [the
plaintiff's] chronic pain remained, at best, unchanged, and may have worsened."  *Id*.

determined that, due to her medical history of multiple failed back surgeries and her continued need to take class II medications, "it was likely [Plaintiff] would be unable to participate in any type of work activity on a full time basis." AR 922. It was further noted that Plaintiff's level of medication and need to be "bed-ridden for multiple days at a time would impact even limited activity and would be unable to sustain full time work." AR 922.

On July 17, 2015, Hartford determined it was unreasonable to expect Plaintiff to return to full time gainful employment, noting the findings contained in APS 10 dated July 10, 2015 by Dr. Gajraj. AR 912. It was noted Plaintiff was only forty-eight years old and remained disabled, and the benefit end date was listed as 3/13/2034. AR 912-13. Hartford noted its Risk Management resources had been exhausted and that Plaintiff's claim was again referred to LSS (lump sum settlement). AR 913. A Hartford manager, however, determined a lump sum settlement offer would not be appropriate. AR 913-14. Specifically, the manager concluded:

> Clmt reports significant memory issues d/t class II narcotics she is taking for pain relief. Clmt state[s] she is unable to remember things well, has times when there is a spike in her Fentanyl patch that causes her to feel dizzy, nauseous and 'loopy.' Clmt reports she does not drive at all. Clmt states she has a hard time remembering specific dates, numbers, what happened on certain dates and that her husband is tired of being her caretaker. **LSS would not be appropriate based on Clmt's cognitive decline** and her reports that she may be getting a divorce.

AR 913-14 (emphasis added).

Yet, there is nothing in the record indicating Plaintiff's use of class II medications – or the ways in which Plaintiff reported the medications affected her – decreased in any significant way between 2015 and the date Hartford terminated Plaintiff's LTD benefits in late 2016. Nevertheless,

Hartford maintains Plaintiff saw improvement in her functionality by July 2016.[21]

In defending its decision, Hartford states Plaintiff's most recent medical records show she had regained functionality; her functionality was steadily increasing; and she was not experiencing any debilitating side effects from her medications, including any cognitive impairment. Hartford relies primarily on the more recent records from Plaintiff's pain management physician from February 2015 to May 2017. In each record, Dr. Gajraj noted "[Plaintiff] is taking her medication as prescribed without significant side-effects and is gaining benefit in terms of analgesia and

[21] Plaintiff takes issue with Hartford's position that Plaintiff's medical records between 2008 and 2017 demonstrate "significant improvement" by July 2016, arguing medical improvement was not given as a reason for the termination of her benefits in Hartford's denial letter. Docket Entry # 27 at 5-6 (quoting Docket Entry # 26 at 6-7). According to Plaintiff, Hartford's new argument, that the continuous use of Fentanyl and Dilaudid for breakthrough pain has now rendered Plaintiff's functionality improved to the extent she can perform the essential functions of any occupation, is substantially different from the reasons given in the denial letter and is in violation of § 503 of ERISA. Plaintiff also asserts other procedural violations under § 503 of ERISA, which she claims denied her a "full and fair review" of the administrator's decision to deny benefits.

In her briefing, Plaintiff relies on *White v. Life Ins. Co. of N. America*, 892 F.3d 762, n. 2 (5th Cir. 2018), *Hackett v. Xerox Corp. Long-Term Disability Plan*, 315 F.3d 771, 775 (7th Cir. 2003), and *Robinson v. Aetna Life Ins. Co.*, 443 F.3d 389, 393 (5th Cir. 2006), asserting violations of § 503 can support damages and reversal of denial. However, in all three cases, the courts reviewed the plan administrators' decisions under the abuse of discretion, rather than the *de novo*, standard. The Court has been unable to find Fifth Circuit authority directly addressing the impact, if any, that procedural deficiencies may have on cases where the court conducts *de novo* review. *See Ermovick v. Mitchell, Silberberg & Knupp LLP Long Term Disability Coverage for All Employees*, No. 2:05-CV-06018-JHN-VB, 2010 WL 3956819, at *9 (C.D. Cal. Oct. 8, 2010), *aff'd sub nom. Ermovick v. Mitchell Silberberg & Knupp LLP Long Term Disability For All Employees*, 472 Fed. Appx. 459 (9th Cir. 2012) (noting no Ninth Circuit authority directly addressing the issue).

Thus, the Court is not convinced the alleged procedural irregularities are relevant on *de novo* review. *Haber v. Reliance Standard Life Ins. Co.*, No. CV149566MWFMANX, 2016 WL 4154917, at *8 (C.D. Cal. Aug. 4, 2016) (citing *Hoffmann v. Life Ins. Co. of N. Am.*, No. EDCV 13-2011-JGB, 2014 WL 7525482, at *6 (C.D. Cal. Dec. 29, 2014) ("Plaintiff makes numerous and wide-ranging arguments alleging improprieties and procedural mistakes by Defendants [including failure to have plaintiff undergo an independent medical examination]. These would be more relevant if the Court were conducting an abuse of discretion analysis. However, as the Court is conducting a *de novo* review, the focus is on the adequacy of Plaintiff's evidence to support his disability").

increased function."  AR 9-13, AR 1740-49. In each record, Dr. Gajraj also wrote that a review of

her central nervous system found her to be "alert, oriented, no signs of excessive sedation," "[g]ood

remote memory," "[a]dequate attention span and able to concentrate."  *Id.* According to Hartford,

the records showed Plaintiff's medication regimen of Fentanyl patches and Dilaudid pills was

working.  AR 866 (analysis of Dr. Gajraj's medical records).

The Court does not find Dr. Gajraj's comments that Plaintiff was "gaining benefit in terms

of analgesia and increased function" under her medication regime as compelling as Hartford does.

Despite the medications she was taking, Plaintiff was still experiencing pain. In each record, Dr.

Gajraj noted that Plaintiff's chief complaint was right low back pain and right leg pain.  AR 9-13,

AR 1740-49. Importantly, in his June 6, 2017 letter, Dr. Gajraj described Plaintiff's current condition

as follows:

> Gina Pike suffers from chronic pain, secondary to lumbar degenerative disc
> disease/radiculopathy. Although she is capable of performing limited light tasks, I do
> not believe she is capable of working in a competitive environment. Even limited
> physical exertions cause her to require significant down time. If she were to attempt
> to return to even a sedentary work environment, she would require significant time
> off-task each day. I believe she could perform no more than 2-4 hours of work per
> day. She additionally requires the fentanyl patch 100 mcg/hr and Dilaudid **simply to
> achieve limited function**. These medications, however can impact cognition and the
> ability to perform detailed tasks. I consider Ms. Pike to be disabled from competitive
> work.

AR 14 (emphasis added).

Hartford states Dr. Gajraj's letter does not state the Fentanyl and Dilaudid medications

actually impacted Plaintiff, only that they could impact cognition and the ability to perform detailed

tasks.  However, Dr. Gajraj makes it clear he considers Plaintiff to be disabled from competitive

work, noting she could not perform more than two to four hours of work per day and would require

significant time off-task each day.  What is more, in APS No. 9 (dated March 19, 2014) and APS No. 10 (dated July 10, 2015), Dr. Gajraj stated he did not believe Plaintiff was competent to direct the use of her claim proceeds.[22]  AR 1753.

Hartford further asserts Plaintiff's recent medical records do not support Dr. Gajraj's opinions in the June 2017 letter or in APS Nos. 8-10.  However, Dr. Gajraj performed a Sudoscan procedure on May 14, 2015 to detect peripheral neuropathy (damage to the peripheral nerves).  AR 1747-48 (Sudoscan Report).  Plaintiff's Sudoscan found possible early signs of peripheral neuropathy.  AR 1747.  Additionally, records from Plaintiff's treating primary care doctor, Purvi Sanghvi, M.D., from October and December 2016 reveal Plaintiff's chronic pain condition remained unchanged.

At the October 2016 visit to establish care with Dr. Sanghvi, Plaintiff stated she was forgetful and had to write everything down due to her being on high dose narcotics.  AR 6.  Although the examination noted no abnormalities, Plaintiff admitted low back pain. AR 7.  Dr. Sanghvi listed Plaintiff's assessments as Celiac disease and chronic pain syndrome.  AR 6.  Notably, in Dr. Sanghvi's notes from the December 6, 2016 visit (which was approximately one week before Hartford's denial of LTD benefits), Dr. Sanghvi noted on examination Plaintiff's back was "tender to palpation over lumbar-sacral spine."  AR 2.

There is other credible evidence regarding Plaintiff's condition, her pain, and the side effects of her medications. Plaintiff routinely updated Hartford regarding the status of her pain management.  For example, in her June 8, 2011 call, Plaintiff noted Dr. Bernstein had increased her Fentanyl

---

[22] According to Plaintiff, this "strongly suggests that Dr. Gajraj felt [Plaintiff] was experiencing cognitive dysfunction, either secondary to her chronic pain or more likely due to her long-term use of class II narcotics."  Docket Entry # 27 at 3.

medication, but she was still experiencing pain in her right lower back where she has "damaged nerves." AR 920-21. Plaintiff further noted her medications affected her – she was not as coherent as before; her memory was not as good; and she had a hard time remembering things.  AR 921.

More recently, in a Claimant Questionnaire completed by Plaintiff in July 2015, Plaintiff explained her back pain continued to increase after the 2012 surgery to remove the spinal cord stimulator, noting implanting the stimulator had "aggravated the scar tissue and damaged nerves in [her] lower left back area" so that she had pain on both sides of her back "every day."  AR 1786. She stated her pain doctor was prescribing her hydromorphone for the "breakthrough pain," in addition to the Fentanyl patches she was changing every other day; yet, she was still in "severe pain and [] hunched over in pain."  AR 1786.  According to the questionnaire, Dr. Rashbaum had informed Plaintiff she had "significant scarring and nerve damage from when [her] spinal cord collapsed and that it would never get better," and that Dr. Gajraj similarly stated her "situation [was] severe and would never improve."  AR 1786.  Plaintiff also reported in detail how the pain medications significantly affect her memory and her ability to remember things. AR 1787.  In sum, the Court does not agree with Hartford's assertion that the recent medical records show Plaintiff had regained functionality and that she was no longer experiencing significant side effects from her medications.

In further support of its decision, Hartford relies on Plaintiff's self-reported functionality in the July 2016 in-person interview, the observed functionality in the June 2016 video surveillance, Dr. Sklar's IME Report, the First EAR Addendum, and Dr. Lewis' Peer Review Report.  According to Hartford, these show Plaintiff's back pain was being sufficiently managed by the medication regimen of Fentanyl and Dilaudid, such that Plaintiff was not prevented from working forty hours

a week in an occupation for which she was qualified and that met the earnings qualifier in the Policy. The Court finds these other indications of improvement relied upon by Hartford similarly unpersuasive, as explained in further detail below.

### *In-person interview*

Plaintiff was interviewed by Jim Jolly with Hartford on July 1, 2016. AR 1263-1294. During the interview, Plaintiff stated she can walk around the grocery store for about thirty or forty minutes. AR 1268. She also stated she could sit for one hour on a cushioned seat and fifteen minutes on a hard seat; she could occasionally grocery shop when her husband was with her; she could carry up to eleven pounds; and she could bend forward at the waist to pick up something from the ground. AR 1268, 1272-73, 1280.

In his summary report of the interview, Mr. Jolly stated Plaintiff "walked with a smooth but slow stride, bent over posture and shuffling style gait." AR 1607. Although Plaintiff did not spontaneously report any pain in walking, she "exhibited a noticeable difficulty in walking." AR 1607. When Plaintiff stood, she did so with her weight evenly distributed upon her feet, but her "upper body was bent forward as if she was resting on a walker." AR 1607. Throughout the entire interview, Plaintiff complained of pain in her lower back. She did not display any objective signs of cognitive impairment or lack of focus in Mr. Jolly's presence. AR 1608. However, Plaintiff told Mr. Jolly during the interview that her medications make her memory fuzzy, and she has to write things down. AR 1289.

### *Video surveillance*

Hartford also relies on the June 8, 2016 surveillance wherein Plaintiff was observed making "two attempts to get one box down small enough" to fit into a trash bin. AR 1615. However,

Hartford does not explain the contrast between this one incident and Plaintiff's numerous days of relative inactivity, "a noticeable gap in light of her reports that she could obtain temporary relief from pain medications."[23] *See Gross v. Sun Life Assurance Co. of Canada*, 880 F.3d 1, 12 (1st Cir. 2018). As described above, the most recent surveillance took place over five days (April 29-30, May 6, and June 8-9), and the investigator saw no activity by Plaintiff on four of those days.  She did not leave her house.  On June 8, 2016, Plaintiff briefly emerged from her house on two occasions and was seen bending forward and breaking down an empty cardboard box, lifting a hinged lid on her trash can, and moving the can. Hartford treats this only surveilled activity "as decisive over [Plaintiff's] long history of credible pain, without confronting her inactivity during most of the surveillance." *Id*.

Importantly, there is no necessary inconsistency between the limitations Dr. Gajraj identified in APS No. 10 and the surveilled activity.  In his June 2017 letter, Dr. Gajraj noted Plaintiff is capable of performing limited light tasks; even so, she is not capable of working in a competitive environment, even in a sedentary work environment. AR 14.  According to Plaintiff, the limitations, level of activity, and functional ability described in her in-person interview closely matched the level of activity—and inactivity— seen on the video surveillance taken June 8, 2016 and over the course of her claim.  The Court agrees.

The Court does not find breaking down a cardboard box and lifting a trash can lid/moving

---

[23] In her in-person interview, Plaintiff explained she has good days and bad days.  The Fentanyl patch, which helps mask a lot of her pain, lasts two days.  AR 1283-84. After she changes the patch on the second day, she experiences more pain because "it takes a while for it to get back up to a certain level for [her] to feel like [she] can move a little bit better, you know, to kind of get over that pain."  AR 1283.

the trash can inconsistent with Plaintiff's own reports as to her limitations in the July 2015 questionnaire and in her in-person interview.  Plaintiff told Hartford's investigator that she could touch her toes and "probably touch the ground."  AR 1390-91, 1120, 1272-73.  She also stated she can push and pull and can handle light garbage.  AR 1391, 1274, 1286.  Plaintiff stated in her June 7, 2017 Administrative Appeal letter that the video surveillance footage confirmed that she walked with a "shuffling gait and forward-hunched posture."  AR 1390. This posture was also repeatedly confirmed by Mr. Jolly in his summary report of the in-person interview. Mr. Jolly specifically noted Plaintiff displayed a "bent over posture" when standing, walking, and sitting; "[s]he slumped forward when walking and she leaned forward on a pillow when sitting."  AR 1608.

### *The opinions of independent reviewing physicians*

Hartford bases its termination decision on the opinions of independent reviewing physicians, Dr. Sklar and Dr. Lewis.  Dr. Sklar examined Plaintiff in October 2016 prior to Hartford's initial decision to terminate benefits.  AR 1528-30.  As part of its consideration of Plaintiff's appeal, Hartford obtained a Peer Review Report in July 2017 from Dr. Lewis. The Court addresses each in turn.

Hartford asked Dr. Sklar whether, given the totality of the medical evidence and other information provided, he felt there are any restrictions or limitations as to Plaintiff's activity, and if so, would she be capable of performing activity up to forty hours per week with these restrictions. AR 1530.  In response, Dr. Sklar opined Plaintiff could work a light or sedentary occupation up to forty hours a week with the following restrictions and limitations based on her chronic pain condition and "[t]o accommodate her pain:" ability to change positions on an as needed basis with up to six hours per day of sitting and the rest of the day spent in a combination of standing and walking for

up to two hours; occasionally lifting up to twenty pounds; and no repetitive bending or twisting.  AR 1530.  According to Plaintiff, Dr. Sklar took Plaintiff's medical history, conducted his physical examination, and reached his conclusions in only twenty-one minutes.  Docket Entry # 17 at 10-11 (citing AR 1528).  Plaintiff asserts Dr. Sklar erroneously stated pain cannot be a disabling condition (stating "[p]ain is clearly not a reason not to work. . .") and merely suggested that some type of unidentified work could be therapeutic without indicating what type of work would be therapeutic for Plaintiff ("Work then is not only reasonable here it would be a part of the claimant's reasonable treatment plan to treat her pain complaints.").  AR 1530.  Nevertheless, according to Plaintiff, Dr. Sklar did not opine Plaintiff could return to high-level work, such as the type required under the terms of the Hartford policy and suggested by Hartford in its denial letter.[24]

The records reveals that since 2002, Plaintiff has consistently reported that she experienced pain.  Rather than showing improvement of Plaintiff's condition, Dr. Skylar's IME Report supports Plaintiff's position.  On physical examination, Dr. Sklar noted Plaintiff walked with a forward flexed posture holding her back, and she had decreased sensation in the bilateral lower extremities especially in the S1 distribution.  He also noted "[s]traight leg raising to 90 degrees in the seated position cause[d] complaints of back pain."  AR 1529.  There was also moderate tenderness to palpation over the lumbosacral junction and bilateral gluteals and left lateral thigh/greater trochanter region.  Dr. Sklar stated the physical examination was consistent with the diagnosis of chronic unspecified lower back pain.  However, according to Dr. Skylar, there was no "clear evidence of any

_____

[24] According to Plaintiff, the only doctors who state she can work forty hours per week are Hartford's reviewers, Drs. Sklar and Lewis—and neither of them suggest Plaintiff is capable of returning to the type of high-level work that would pay her at least $4,171.55 per month. Docket Entry # 28 at 3.

persistent radiculopathy and records [were] not consistent with the diagnosis of chronic radiculopathy either." AR 1529. Dr. Skylar acknowledged Plaintiff has pain but did not believe pain could or should preclude a claimant from working.

However, pain can either prevent or make difficult the tasks required by an occupation.  *See Audino v. Raytheon Co. Short Term Disability Plan,* 129 Fed. Appx. 882, 885 (5th Cir.2005) ("We are also troubled by MetLife's failure to accord weight to Audino's consistent complaints of pain, even though those complaints were documented in her medical records for years before she sought benefits and there is no indication that she overstated her pain once she decided to seek benefits."); *see also Schexnayder v. CF Indus. Long Term Disability Plan for its Employees*, 553 F. Supp. 2d 658, 666-67 (M.D. La. 2008), *aff'd in part, rev'd in part sub nom. Schexnayder v. Hartford Life & Acc. Ins. Co.*, 600 F.3d 465 (5th Cir. 2010) ("Although pain cannot always be objectively quantified, Mr. Shexnayder's pain is corroborated by medical evidence finding degenerative disc disease and spinal stenosis and notations of pain in the results of the FCE. The Defendant abused its discretion in discounting the subjective evidence of Plaintiff's pain and the objective evidence corroborating the disability.").

In his Peer Review Report, Dr. Lewis agrees with Dr. Skylar's independent medical evaluation and finds Plaintiff would have the capacity to perform gainful employment on a full time basis with certain "ongoing and indefinite" restrictions.  AR 1349-50.  According to Dr. Lewis, although Plaintiff has continued pain complaints, "there are no objective findings that would prevent her ability for sustainable work 40 hours per week."  AR 1350.

The Court finds Dr. Lewis' post-decision report minimally persuasive as well.  First, Dr. Lewis did not examine Plaintiff in person.  Although there is no treating physician preference in the

ERISA context, *see Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003), "this does not mean that a district court, engaging in a *de novo* review, cannot evaluate and give appropriate weight to a treating physician's conclusions, if it finds these opinions reliable and probative."[25] *Reetz*, 294 F. Supp. 3d at 1083 (quoting *Paese v. Hartford Life & Accident Ins. Co.*, 449 F.3d 435, 442 (2d Cir. 2006)). Here, the treating physicians' relationships with Plaintiff allowed them to personally observe the effects of Plaintiff's diagnoses and assess the credibility of her reports of pain. Dr. Gajraj, Plaintiff's pain management treating physician for over five years, stated in 2017 that Plaintiff suffers from chronic pain, secondary to lumbar degenerative disc disease/radiculopathy and is disabled.  AR 14.  In contrast, Dr. Lewis, because he did not personally examine Plaintiff, could not have observed the effect of Plaintiff's chronic pain or assessed her credibility. As in *Reetz*, the Court finds the treating physicians' medical opinions to be more reliable and probative of Plaintiff's condition than Dr. Lewis' report. 294 F. Supp. 3d at 1083 (citing *Oldoerp*, 12 F. Supp. 3d at 1250 ("[W]hen an in-person medical examination credibly contradicts a paper-only review conducted by a professional who has never examined the claimant, the in-person review may render more credible conclusions.")).

Additionally, the Court finds certain aspects of Dr. Lewis' report troubling.  The record establishes Plaintiff underwent lumbar fusion surgery at L4-5 and L5-S1 in December 2002.  AR 532-33.  After surgery, Plaintiff experienced a brief time when her pain improved, but she began to

---

[25] In *Black & Decker*, the Supreme Court stated that, unlike the SSA, ERISA plan administrators need not give special deference to a claimant's treating physician.  538 U.S. at 834. However, the Court in *Black & Decker* also observed that ERISA plan administrators "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Id.*

deteriorate in 2004.  AR 521.  Dr. Martin performed surgery on L3-4 on March 25, 2008.  In March

2009, Plaintiff had surgery to remove the L4-S1 hardware which had been inserted in the 2002

surgery. AR 644.

> However, Dr. Lewis' report presents the timeline as follows:

> This claimant is a 50-year old female with lower back pain.  She has a history of posterior lumbar interbody fusion at L4-L5 and L5-S1 on **12/04/12**.  She previously underwent a extreme lateral interbody fusion L3-4 . . . on 03/25/08.  She underwent surgery on 03/25/09 to explore the fusion and remove existing spinal hardware.  She also underwent a spinal cord stimulator implant in December 2009.  She continues to utilize this device for pain control with slight improvement in her symptoms.

AR 1343 (emphasis added).  Later in the same report, Dr. Lewis again states Plaintiff's  L4-L5 and

L5-S1 surgery was performed in 2012, rather than 2002.  AR 1348.  In both instances, Dr. Lewis

states Plaintiff "previously" underwent surgery on L3-4 on March 25, 2008. This belies Hartford's

argument that Dr. Lewis' report had a "typographical error on [the] surgery date being 2012."

Docket Entry # 26 at 27.  Although Hartford argues the error does not change the conclusions in the

report, the Court is not so sure.  According to Plaintiff, it is important that Plaintiff's L4-S1 surgery

predates her L3-4 surgery because "that suggests that she is suffering from Transitional Syndrome,

where the prior fusion causes increased stress on adjacent levels" and also implies "possible further

deterioration in the future."  Docket Entry # 17 at 27.

There are other errors as well.  Dr. Lewis states Plaintiff continued to utilize the spinal cord

stimulator.  AR 1343. However, the record reveals the stimulator was surgically removed in 2012

because it caused an increase in Plaintiff's symptoms.  Dr. Lewis also states "[t]hroughout the

documentation the claimant reports that she has functional benefit without adverse medication side

effects."  AR 1349.   For these reasons, the Court gives little weight to Dr. Lewis' opinion.

### The EAR Addendums

Hartford's first EAR determined there were no jobs Plaintiff could perform that would pay a gainful wage under the Policy criteria.  AR 1926-27. On December 8, 2016, Hartford updated the first EAR using Dr. Sklar's restrictions and limitations in the IME Report.  AR 1508-09. Unlike the first EAR, the First EAR Addendum identified several occupations Plaintiff was well-suited for based on her education, training, and work history, and which met the earnings requirement in the Policy.  AR 1508-09. Plaintiff asserts the First EAR Addendum, which was the only new EAR available to Hartford at the time of its initial denial, disregarded the functional limitations by Plaintiff's treating doctors, the impact of her chronic pain, and the documented cognitive decline caused by her narcotic medications.  Docket Entry # 17 at 11. According to Plaintiff, Hartford did not consider the impact of Plaintiff's required daily use of cognitively impairing medication such a Fentanyl and Dilaudid on her ability to work at this level. Nor did Hartford consider that under Social Security standards for disability, Plaintiff is deemed to be unable to engage in Substantial Gainful Activity, which is work that would pay at least $1,170.00 per month.[26]

As noted above, in determining whether Plaintiff is capable of performing the essential duties of any occupation, the Court accords significant weight to the evaluation of Plaintiff by her treating physicians, who have repeatedly concluded Plaintiff can sit, stand, and walk for no more than four hours a day. These evaluations, along with the evidence regarding Plaintiff's chronic pain and the effects of her pain medication, persuade the Court Plaintiff could not continuously engage in any

---

[26] Plaintiff states on April 10, 2017, four months after Hartford denied her claim, the Social Security Administration reevaluated Plaintiff's claim and determined she continued to be Totally Disabled under SSA standards.  *See* AR 1361-62.

occupation for which she would be qualified.

The First EAR Addendum relied upon Dr. Sklar's IME Report.[27] The Court accords minimal weight to this report. As discussed above, Dr. Skylar's conclusions contradicted those of Plaintiff's treating physicians and thus the First EAR Addendum may not have accurately returned jobs that could be performed by Plaintiff. "In short, the [C]ourt finds that the search did not accurately reflect [Plaintiff's] limitations, and thus, the [C]ourt is not convinced that the jobs returned by the search are ones that [Plaintiff] can perform."[28] *Reetz*, 294 F. Supp. 3d at 1085.

Although not binding, the Court finds the SSA determination is also relevant. *See Gellerman v. Jefferson Pilot Fin. Ins. Co.*, 376 F. Supp. 2d 724, 735 (S.D. Tex.2005) (noting that "no court has held that an SSA determination is completely irrelevant"). Hartford advocated Plaintiff's cause before the SSA. According to Plaintiff, "[i]t is ironic that this determination, which was sought by Hartford, supported by a vendor hired by Hartford, and resulted in financial gain to Hartford of over $194,000.00 was disregarded in order to justify denying further benefits." AR 1397.[29] The SSA's

---

[27] In preparing the First EAR Addendum, the consultant was instructed to consider the function opined by Dr. Sklar (that Plaintiff could work forty hours per week, sit six hours per day, and stand and walk two hours per day, with no repetitive bending or twisting) and determine if the updated function would "alter the outcome of the [first] EAR completed on 4/22/10." AR 1508.

[28] According to Plaintiff, the sole evidence Hartford relies on for its contention that Plaintiff is capable of earning at least $4,171.55 is the revised EAR it conducted immediately prior to denying her claim. Plaintiff asserts this was an in-house report prepared by Hartford employees—not independent experts. In order to secure the Second EAR Addendum, Hartford instructed that the analyst not consider the restrictions and limitations provided by any of Plaintiff's treating physicians. The Court accords little weight to the Second EAR Addendum.

[29] The Policy provides that monthly benefits will be reduced by income from other benefit, including those from the SSA.

determination that Plaintiff remains Totally Disabled under its standards, as of April 10, 2017, is further evidence that Plaintiff is both unable to perform the essential duties of any occupation and that she is unable to earn the threshold salary under the Hartford Policy terms.

The Court, having considered all of the evidence relied upon by Hartford in justifying its termination of benefits, finds no evidence of improvement in Plaintiff's condition since Hartford previously found she was unable to sustain full time work in any occupation.  Based on the Agreed Administrative Record, Plaintiff has demonstrated by a preponderance of the evidence that she cannot perform the essential duties, which includes the ability to work a full work week, of any occupation for which she qualifies.  Plaintiff has shown by a preponderance of the evidence that her disability persisted beyond December 14, 2016.  Accordingly, it was improper for Hartford to cease Plaintiff's LTD benefits, and Plaintiff is entitled to the reinstatement of her LTD benefits beginning December 15, 2016.

## C.    Other equitable remedies

### *Prejudgment interest*

Plaintiff has also requested that pre-judgment interest be awarded.  While pre-judgment interest is available in ERISA cases, ERISA does not explicitly provide for prejudgment interest, and whether to grant such a remedy is thus within the discretion of the district court. *Cottrill v. Sparrow, Johnson & Ursillo, Inc*., 100 F.3d 220, 223 (1st Cir. 1996), *abrogated on other grounds by Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 130 S.Ct. 2149, 176 L.Ed.2d 998 (2010); *see also Perez v. Bruister*, 823 F.3d 250, 274 (5th Cir. 2016) (citing *Hansen v. Cont'l Ins. Co.,* 940 F.2d 971, 984 n.11 (5th Cir.1991), *abrogated on other grounds by CIGNA Corp. v. Amara,* 563 U.S. 421, 131

S.Ct. 1866, 179 L.Ed.2d 843 (2011)). "It is not awarded as a penalty, but as compensation for the use of funds." *Whitfield v. Lindemann,* 853 F.2d 1298, 1306 (5th Cir.1988).

The Court finds Plaintiff is entitled to receive LTD benefits from December 15, 2016, and to recover pre-judgment interest on those unpaid benefits.

### *Costs and attorney's fees*

The Federal Rules of Civil Procedure state that "[u]nless a federal statute, these rules, or a court order provides otherwise, costs—other than attorney's fees—should be allowed to the prevailing party." FED. R. CIV. P. 54(d)(1). ERISA provides that "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1). "The Fifth Circuit has held that an award of costs in an ERISA case is limited to those listed in 28 U.S.C. § 1920." *Keith v. Metro. Life Ins. Co.*, No. CV H-15-1030, 2017 WL 2537296, at *10 (S.D. Tex. June 9, 2017) (citing *Humphrey v. United Way of Texas Gulf Coast*, 802 F. Supp. 2d 847, 868 (S.D. Tex. 2011) (citing *Cook Children's Medical Center v. New England PPO Plan of General Consolidated Management, Inc.*, 491 F.3d 266, 275-76 (5th Cir. 2007), *cert. denied*, 552 U.S. 1180 (2008))).

The Supreme Court has held that "a court 'in its discretion' may award fees and costs 'to either party,' as long as the fee claimant has achieved 'some degree of success on the merits.'" *Hardt v. Reliance Standard Life Insurance Co.*, 130 S.Ct. 2149, 2152 (2010) (citation omitted). The Fifth Circuit established a five-factor test for deciding whether to award attorneys' fees under § 1132(g)(1) in *Iron Workers Local No. 272 v. Bowen*, 624 F.2d 1255, 1266 (5th Cir. 1980). Since the Supreme Court's decision in *Hardt*, the Fifth Circuit has held the *Bowen* test is no longer mandatory. *See, e.g.,*

*LifeCare Management Services LLC v. Insurance Management Administrators Inc.*, 703 F.3d 835, 846-47 (5th Cir. 2013); *Lincoln Financial Co. v. Metropolitan Life Insurance Co.*, 428 Fed. Appx. 394, 396 (5th Cir. 2011) (per curiam) (unpublished). However, the Court finds those factors helpful:

> In deciding whether to award attorneys' fees to a party under section 502(g), therefore, a court should consider such factors as the following: (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of attorneys' fees; (3) whether an award of attorneys' fees against the opposing parties would deter other persons acting under similar circumstances; (4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and (5) the relative merits of the parties' positions.

*Keith*, 2017 WL 2537296, at *10-11 (quoting *Bowen*, 624 F.2d at 1266 (5th Cir. 1980) (citations omitted)).

The Court first considers the degree of the opposing party's bad faith. Although the Court did not need to address in its *de novo* review above whether Hartford's decision to terminate Plaintiff's LTD benefits was influenced by its inherent conflict of interest, the Court considers the conflict of interest here. A finding of bad faith requires more than simply establishing there was a conflict of interest. *See Carolina Care Plan Inc. v. McKenzie,* 467 F.3d 383, 390 (4th Cir.2006) (holding that although the record showed that the plan administrator's decision furthered its financial interest, the first factor in the *Bowen* analysis did not weigh against the plan administrator absent evidence of bad faith), *abrogated on other grounds by Glenn,* 128 S.Ct. at 2343. Instead, a plaintiff must prove that the conflict of interest actually and improperly motivated the decision. This higher standard separates those cases in which a conflict of interest tips the scale in favor of reversing the plan administrator's benefits determination from those cases in which the plan administrator's bad faith clearly motivated the decision.

Although an abuse of discretion case, the Court finds *Hines v. Unum Life Ins. Co. of America*, 2018 WL 6599404 (N.D. Ohio Dec. 17, 2018) instructive. Here, similar to *Hines*, the "record does not offer a smoking gun revealing [Hartford's] bad faith, but several factors add up to reveal [Hartford's] duty to pay fees." *Id.* at *6. After paying Plaintiff's LTD benefits for so many years, the Court finds noteworthy the timing of Hartford's decision to terminate, as reflected in Hartford's own documentation. On July 17, 2015, Hartford determined it was unreasonable to expect Plaintiff to return to full time gainful employment, noting the findings contained in APS 10 dated July 10, 2015 by Dr. Gajraj. AR 912. It was noted Plaintiff was only forty-eight years old and remained disabled, and the benefit end date was listed as 3/13/2034. AR 912-13. Hartford noted its Risk Management resources had been exhausted and that Plaintiff's claim was again referred to LSS (lump sum settlement). AR 913.

A Hartford manager, however, determined a second lump sum settlement offer (Plaintiff did not accept the first one offered) would not be appropriate based on Plaintiff's cognitive decline. AR 913-14. However, in April 2016, Hartford reassigned Plaintiff's claim to a Specialty Analyst and changed her Continuing Ability Review ("CAR") level. AR 909. Hartford again referred Plaintiff's claim to its SIU, but noted that if SIU again closed its file without need for further review, the Specialty Analyst would review the claim to determine if additional claim management was needed; if no additional claim management was needed, the Specialty Agent would determine Plaintiff's appropriate CAR level. AR 909. After this reassignment, Hartford proceeded with its "preferred course of action." *See Hines*, 2018 WL 6599404, at *6.

As a large insurance company, Hartford has the ability to satisfy the award (*Bowen* factor two), and such an award may deter Hartford and other insurance companies from similar conduct

going forward (*Bowen* factor three).  The litigated issues are common in ERISA benefit denial cases.

*See Hines*, 2018 WL 6599404, at *7.  Finally, the relative merits of the parties' positions are not

particularly close, especially considering Hartford's inherent conflict of interest as the payor and

benefits eligibility decider (*Bowen* factor five).  *Id.* at *6.  Overall, these circumstances support an

award to Plaintiff for attorney's fees and costs, in addition to the benefits amount owed to her under

the Policy.[30]  Weighing all the factors, the Court finds they justify an attorney's fees and costs award

for Plaintiff.

## V.  CONCLUSION

Based on the foregoing, it is

**RECOMMENDED** that Plaintiff's Motion for Judgment on the Record (Docket Entry # 17)

be **GRANTED**.  It is further

**RECOMMENDED** that Defendant Hartford Life and Accident Insurance Company's Cross-

Motion for Judgment on the Record (Docket Entry # 25) be **DENIED**.  It is further

**RECOMMENDED** that Plaintiff be directed to file, within twenty days from the date of any

Order adopting this Report and Recommendation, a motion for pre-judgment interest, costs and

attorney's fees.  The motion should address the appropriate rate to be prescribed for the pre-judgment

interest.  The motion should also be supported by evidence reflecting the reasonable amount of costs

and fees sought, and shall include argument as to the authority upon which such fees may be granted.

Hartford shall file a response, if any, in accordance with the Local Rules, and Plaintiff may file a

reply in accordance with the same.

---

[30] Although the Court does not find the *Bowen* factor four weighs in favor of Plaintiff, the Court notes this case did present (although did not necessarily resolve) a significant legal issue, namely how to address, if at all, alleged procedural violations of § 503 in a *de novo* review.

<u>Objections</u>

Within fourteen (14) days after receipt of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations of the magistrate judge.   28 U.S.C.A. 636(b)(1)(C).

A party's failure to file written objections to the findings, conclusions and recommendations contained in this Report within fourteen days after being served with a copy shall bar that party from de novo review by the district judge of those findings, conclusions and recommendations and, except on grounds of plain error, from appellate review of unobjected-to factual findings and legal conclusions accepted and adopted by the district court.  *Douglass v. United Servs. Auto. Ass'n.*, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc), superseded by statute on other grounds, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

**SIGNED this 31st day of January, 2019.**

CAROLINE M. CRAVEN
UNITED STATES MAGISTRATE JUDGE